UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION


**UNITED STATES OF AMERICA,**      )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )  **Docket No.** 21-cr-30021
                                   )
**THOMAS J. WILKINSON IV,**        )
                                   )
                    Defendant.     )  May 1, 2023


**<u>SENTENCING</u>**


**BEFORE THE HONORABLE COLLEEN R. LAWLESS**
UNITED STATES DISTRICT JUDGE


<u>**A P P E A R A N C E S**</u> :

For the Plaintiff:     Sarah Elizabeth Seberger
                       United States Attorney's Office
                       318 South Sixth Street
                       Springfield, IL 62701
                       217-492-4450;

For the Defendant:     Thomas W Patton
                       Federal Public Defender
                       Suite 1500
                       401 Main St
                       Peoria, IL 61602
                       309-671-7891




Court Reporter:        KAILEY FENWICK, RPR
                       U.S. District Court
                       600 Monroe Street
                       Springfield, IL 62701


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

## **INDEX**

**WITNESS:**                                                    **PAGE:**

KEAGAN ROBINSON, GOVERNMENT'S WITNESS
        DIRECT EXAMINATION                                15
            BY MS. SEBERGER
        CROSS-EXAMINATION                                 23
            BY MR. PATTON
        REDIRECT EXAMINATION                              33
            BY MS. SEBERGER


**EXHIBITS:**

 None.

1       THE COURT:  We are on the record on 21-CR-30021, the

2    United States v. Thomas Wilkinson, IV.  We are present

3    today for a sentencing hearing.

4        The government is represented by the AUSA

5    Sarah Seberger.  Mr. Wilkinson is represented by his

6    attorney, the Federal Public Defender Thomas Patton.

7    Also present is U.S. Probation Officer Michelle Cyrus,

8    who performed the presentence investigation report.

9        On November 10th of 2022, Mr. Wilkinson, before

10   U.S. Magistrate Judge Karen L. McNaught, entered guilty

11   pleas in Counts 1, 2, and 3 of the indictment and

12   consented to the forfeiture allegation.

13       Count 1 charged possession with intent to

14   distribute 50.0 grams or more of actual

15   methamphetamine, in violation of Title 21 U.S.C.

16   Section 841(a)(1) and (b)(1)(A).

17       Count 2 charged possession of a firearm in

18   furtherance of a drug-trafficking crime, in violation

19   of Title 18 U.S.C. Section 924(c)(1)(A)(1).

20       And Count 3 charged possession of a firearm

21   after having been convicted of a felony, in violation

22   of Title 18 U.S.C. Section 922(g)(1) and 924(e).

23       On December 1st of 2022, Judge Myerscough

24   accepted the -- Mr. Wilkinson's pleas of guilty as to

25   Count 1, 2, and 3 and adjudged him guilty of those

1    offenses.

2          The case has since been transferred to me, and I

3    have read the revised presentence investigation report,

4    the government's sentencing commentary, and the

5    defendant's sentencing commentary.

6          Attached to the Government's commentary is a

7    transcript of the change of plea hearing.  Attached to

8    the defendant's commentary is a U.S. Sentencing

9    Commission document titled *Quick Facts Career*

10   *Offenders*.  Also attached are the character letters on

11   behalf of Mr. Wilkinson from Ruth Datillo,

12   Mr. Wilkinson's mother; Dawn Datillo, his sister;

13   Freda Faulkener, a friend of 40 years; and Paul, there

14   was no last name given, who grew up with Mr. --

15          Yes?

16      MR. PATTON:  And on that last point, Your Honor,

17   it's Paul Haun, H-A-U-N.  I apologize.

18      THE COURT:  No.  Thank you very much.

19          Attached also are defendant's medical records,

20   which notes some of the medications he has taken for

21   pain for various medical conditions.

22          I've read and considered each of the letters

23   from Mr. Wilkinson's family and friends in addition to

24   the other materials outlined.

25          Now, there are some objections to the revised

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1  PSR.

2        Mr. Wilkinson, have you received a copy of the

3  revised presentence report and discussed it with

4  counsel?

5     THE DEFENDANT:  Yeah.  We went over it.

6     THE COURT:  You've went over it, all right.  Are you

7  satisfied with Mr. Patton's representation?

8     THE DEFENDANT:  Yes, ma'am.

9     THE COURT:  Thank you very much.

10        I understand there is one objection by the

11  government as to paragraph 7 of the revised PSR.  And

12  that objection would affect paragraphs 107 and 113.  Is

13  that correct, Ms. Seberger?

14     MS. SEBERGER:  Yes, Your Honor.

15     THE COURT:  Thank you.

16        There are also objections by the defendant to

17  the revised PSR as to paragraphs 35 and also to

18  paragraphs 68 through 78, 80, and 81 of the PSR.  Does

19  that remain true, Mr. Patton?

20     MR. PATTON:  Yes, Your Honor.

21     THE COURT:  Thank you.

22        I'll ask you directly, Mr. Wilkinson, do you

23  have those objections to the revised PSR that I've just

24  identified?

25     THE DEFENDANT:  (No response.)

1      MR. PATTON:  May I have one moment, Your Honor?

2      THE COURT:  Absolutely.

3                  *(Off-the-record discussion had.)*

4      MR. PATTON:  Your Honor, Mr. Wilkinson today raised

5   a factual objection that we'd like to raise.  It's on

6   page -- paragraph 8 -- I'm sorry, no.  It's to

7   paragraph 23, which is on page 8.

8      THE COURT:  Mm-hmm.

9      MR. PATTON:  And the very last sentence of

10  paragraph 23 says that at -- this was at the Montgomery

11  County Jail, that the 9mm ammunition round was located

12  in Mr. Wilkinson's pants pockets.  Mr. Wilkinson does

13  not believe that he had any ammunition rounds in his

14  pocket.  I apologize for not raising that earlier.

15     THE COURT:  All right.  Thank you very much,

16  Mr. Patton.

17          Ms. Seberger, anything you'd like to say on

18  that?

19     MS. SEBERGER:  Just briefly, Your Honor.

20          The facts as outlined in the PSR are based on

21  police reports and documentation the government

22  provides to probation.  I have no reason to doubt the

23  accuracy of those.

24          And the only other piece I will add in terms of

25  the defendant's recollection is as outlined in the PSR.

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

1    The defendant was under the influence of

2    methamphetamine at the time.  So it's quite possible

3    that his recollection may not be as accurate as that of

4    the sober officer who documented the incident.

5         Thank you.

6      MR. PATTON:  Your Honor, it is in the police reports

7    that were provided in discovery that when he was booked

8    in at the Montgomery County Jail, they found a round in

9    his pocket.  So it -- in fairness, because we hadn't

10    raised this earlier, it is in the discovery that was

11    provided, and Mr. Wilkinson just disagrees with that.

12      THE DEFENDANT:  (Indiscernible)

13      THE COURT:  Mr. Patton, just -- or I'm sorry,

14    Mr. Wilkinson, just make sure to let your attorney

15    speak on your behalf.  If you have anything you would

16    like to tell him, just make sure to do so.  But you

17    don't want to specifically address me unless I'm

18    addressing you with a question for you to answer, okay?

19      THE DEFENDANT:  I'm sorry.

20      THE COURT:  No problem.

21         Now, as it relates to -- I understand,

22    Ms. Seberger, that you are intending to call at least

23    one witness; is that correct?

24      MS. SEBERGER:  Yes, Your Honor.  I'm going to call

25    Special Agent Robinson.  I'm going to try and be as --

1    I'm going to try to keep it brief.

2        THE COURT:  And is that testimony going to pertain

3    to your objections?

4        MS. SEBERGER:  No.  It's going to pertain to one of

5    the defendant's objections.

6        THE COURT:  To one of the defendant's objections,

7    okay.

8        MS. SEBERGER:  Yes, Your Honor.

9        THE COURT:  Okay.  And, Mr. Patton, it's my

10   understanding you are potentially going to be

11   presenting either a PowerPoint or evidence today?

12       MR. PATTON:  It's just during argument; I just have

13   some slides, Your Honor.  And we have the objection --

14   the objection to Mr. Wilkinson not receiving the minor

15   participant adjustment.

16       THE COURT:  All right.

17       MR. PATTON:  The probation office is correct that,

18   ultimately, it would not change the guideline

19   calculation because the career offender guideline

20   trumps that.

21           And so -- but that's the objection we have and

22   I believe -- well, that's the testimony that the

23   government intends to put on.  I have no evidence to

24   put on in support of that.

25       THE COURT:  Thank you very much.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1            So as to the government's objections to

2    paragraph 7, 107, and 113, I can address those prior to

3    the presentation of any evidence.

4            The government objects to paragraph 7, and that

5    paragraph states that on November 9th, 2022, the

6    government filed an information to establish prior

7    conviction under Title 21 U.S.C. Section 851(a)(1),

8    advising that defendant's prior conviction for

9    trafficking drugs in the second degree in Saint Francis

10   County, Missouri, Circuit Court Case

11   No. 01-cr-615236-01, qualifies as a basis for

12   sentencing enhancement, which would mean that defendant

13   faces a possible sentence of ten years or more of

14   imprisonment.

15           Paragraph 7 concludes by stating that based on

16   the review of the charging document related to the

17   Saint Francis Circuit Court case, the probation office

18   has determined that the offense does not qualify as a

19   basis for sentencing enhancement.

20           The government acknowledges having included the

21   wrong conviction in the 851(a) notice, but states that

22   the government did provide notice in the indictment of

23   another qualifying conviction, which was an attempt to

24   manufacture a controlled substance in Saint Francis

25   County, Missouri, Circuit Case No. 11SF-CR-02120-01.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1        It also was indicated at the change of plea

2    hearing that pursuant to plea negotiations, the

3    government would proceed on one qualifying 851

4    conviction.  The statutory range was explained to the

5    defendant and acknowledged by counsel,

6    Elisabeth Pollock, and by Mr. Wilkinson.

7        The government, thus, claims that while notice

8    was not perfect, it has substantially complied with the

9    requirements of Section 851(a), and the defendant has

10   had notice of an enhanced mandatory minimum.

11   Therefore, the government claims that the statutory

12   minimum sentence of imprisonment as to Count 1 is

13   15 years, followed by a minimum 10-year term of

14   supervised release.

15       The defendant in the commentary acknowledges

16   that the qualifying prior conviction is referenced in

17   the special findings provision of the indictment.

18   Because the statutorily required notice was not filed

19   as to the proper conviction, however, the defendant

20   objects to the enhanced mandatory minimums as to

21   Count 1.

22       Section 851(a) states in relevant part that no

23   person who stands convicted of an offense under this

24   part shall be sentenced to increased punishment by

25   reason of one or more prior convictions unless before

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    trial or before entry of a plea of guilty the United

2    States attorney files an information with the Court and

3    serves a copy of such information on the person or

4    counsel for the person which states in writing the

5    previous convictions to be relied upon.

6            In *United States v. Williams*, the Seventh

7    Circuit stated that the purposes of 851(a)(1) are to

8    provide the defendant with an opportunity to challenge

9    the enhancement and give him enough information about

10   the potential sentence to enable the defendant to make

11   a fully informed decision about whether to plead guilty

12   or to go to trial.

13           Indictments are returned by the Grand Jury, and

14   the United States cannot file an indictment.

15   Therefore, allegations and special findings in the

16   indictment are solely the province of the Grand Jury.

17   Section 851 makes no mention of using the Grand Jury to

18   perform the tasks that are statutorily assigned to the

19   United States Attorney.

20           The government contends that actual notice is

21   what's important, not strict compliance with the notice

22   requirements.  In *United States v. Lawuary*, the Seventh

23   Circuit, for example, noted that the statute does not

24   specify the form the filing must take, and we have, in

25   past decisions, been flexible with regard to what the

1    government must do in order to comply with Section 851.

2         The Court further stated, *with the idea that*

3    *Section 851's purpose is to provide the defendant with*

4    *adequate notice, this Court has stated that the*

5    *Section 851 notice can be provided through various*

6    *methods, as long as the defendant receives sufficient*

7    *written notice containing the necessary information*

8    *before he enters into a guilty plea or goes to trial.*

9         More recently, in *United States v. Williams*, a

10   2009 Seventh Circuit case, the Seventh Circuit stated,

11   *that the purposes of the statute are to give the*

12   *defendant an opportunity to contest the use of his*

13   *prior conviction or convictions to enhance his sentence*

14   *and to give him enough information about the potential*

15   *sentence to enable him to decide intelligently whether*

16   *to plead guilty or to throw the dice by going to trial.*

17        In *United States v. Johnsen*, a 2006 Eighth

18   Circuit case, the Eighth Circuit found that including

19   the 851 notice in the indictment satisfies the notice

20   requirement.  However, the Seventh Circuit has not

21   ruled on that precise issue.

22        The Court recognizes that the government did not

23   strictly comply with the requirements of 851(a), but

24   that was simply due to an oversight or an innocent

25   mistake.  The defendant had an opportunity to contest

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1   the use of his prior conviction to enhance his sentence

2   and had sufficient information to decide whether to

3   plead guilty or to go to trial.

4          Given what the Seventh Circuit has said about

5   the purposes of 851(a) and that it has been flexible

6   regarding what the government must do and its statement

7   that notice can be provide through various methods, I

8   do believe that the Seventh Circuit would follow the

9   Eighth Circuit's decision in *Johnson* and find that the

10  defendant did receive sufficient notice before deciding

11  whether to proceed guilty -- to proceed with the guilty

12  plea or go to trial in this case.  That notice included

13  the proper conviction being included in the indictment

14  and the statements at the change of plea hearing,

15  including the defendant's acknowledgement that he

16  understood the specific penalties.

17         As defendant's commentary states, the defendant

18  was told the mandatory penalty on Count 1 was 15 years

19  imprisonment.  Therefore, I will sustain the

20  government's objection to paragraph 7 and find that the

21  attempt manufacture of a controlled substance in Saint

22  Francis County, Missouri, Circuit Court Case

23  No. 11SF-CR020120-01, qualifies for purposes of the

24  Section 851(a)(1) notice.

25         As a result, paragraph 107 should state that the

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

 1  minimum term of imprisonment is 15 years instead of 10

 2  years.  And paragraph 113 should say that the Court

 3  must impose a term of supervised release of at least 10

 4  years instead of 5 years.

 5        Now, defendant's objection to paragraph 35 is

 6  regarding the minor participant.  And so my

 7  understanding, Mr. Patton, you are not intending to

 8  introduce any evidence as to that?

 9     MR. PATTON:  That's correct, Your Honor.

10     THE COURT:  Thank you very much.

11        Ms. Seberger?

12     MS. SEBERGER:  I do have evidence, Your Honor, and I

13  would call Special Agent Robinson if now is an

14  appropriate time.

15     THE COURT:  Yes, it is.

16     MS. SEBERGER:  Okay.  Thank you.

17     THE COURT:  The clerk will swear you in.

18                (Witness sworn.)

19     THE COURT:  Thank you.  You may be seated.

20        You may proceed when you're ready.

21     MS. SEBERGER:  Thank you, Your Honor.

22        I would typically move to the podium; is that

23  okay?

24     THE COURT:  However you would like to proceed.  You

25  may be at the podium, or you can be where you are.

```
 1      MS. SEBERGER:  Okay.
 2         KEAGAN ROBINSON, GOVERNMENT'S WITNESS, SWORN
 3                    DIRECT EXAMINATION
 4   BY MS. SEBERGER:
 5      Q.  Sir, can you please state your name and spell it
 6   for our court reporter, both your first and last name,
 7   please?
 8      A.  Yes.  Special Agent Keagan Robinson;
 9   K-E-A-G-A-N; Robinson, R-O-B-I-N-S-O-N.
10      Q.  Sir, where do you work?
11      A.  Illinois State Police.
12      Q.  In what capacity?
13      A.  I work in the Central Illinois Enforcement
14   Group.  It's a drug task force.  I'm a Task Force
15   Officer for the Drug Enforcement Administration.
16      Q.  So I want to start first, the Central Illinois
17   Enforcement Group, can you just briefly explain -- you
18   did say it was a drug task force.  And can you explain
19   all your responsibilities and what that group is?
20      A.  Yes.  I'm a special agent within the group.  I
21   investigate any and all drug crimes in the Central
22   Illinois area and violence in other crimes associated
23   with drugs.
24      Q.  So would it be fair to say -- and the Central
25   Illinois Enforcement Group, is sometimes referred to as
```

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    CIEG, right?

2        A.    Sure.

3        Q.    As the acronym?

4        A.    Yes.

5        Q.    Would it be fair to say that, yes, CIEG focuses

6    often on drug-trafficking crimes, but also its

7    portfolio includes additional crimes of just crimes of

8    violence, human trafficking, and other types of

9    offenses?

10       A.    Yes.

11       Q.    Can you just briefly explain for the Court your

12   background in terms of training?

13       A.    Yes.  I've been with the DEA Task Force for

14   three years now.  I worked in the Central Illinois

15   Enforcement Group for almost two years as a local

16   officer and then the same amount of time, three years,

17   as a special agent.

18            I've been to numerous trainings with the DEA;

19   money laundering trainings, methamphetamine clandestine

20   lab trainings at Quantico; Illinois State Police basic

21   narcotics, advance narcotics trainings; and then DEA

22   training is similar and a lot of on-the-job training as

23   well.

24       Q.    So fair to say you've had training from both the

25   State of Illinois and also Federal Law Enforcement in

1    investigating drug offenses?

2       A.   Yes.

3       Q.   So let's talk now about your background as it

4    relates to experience.  Can you briefly summarize that

5    for the Court?

6       A.   Yes.  I've worked for the Menard County

7    Sheriff's Office as an officer and with the Central

8    Illinois Enforcement Group during my time there, with

9    the Athens Police Department, Lincoln Police

10   Department, and then Illinois State Police.

11      Q.   In total, how long have you been a law

12   enforcement officer?

13      A.   Approximately ten years.

14      Q.   And what's your educational background?

15      A.   I got my bachelors in science at Eastern

16   Illinois University.

17      Q.   Have you previously testified in any court as an

18   expert witness?

19      A.   Yes, ma'am.

20      Q.   And can you explain where and when to the Court?

21      A.   Previously, testified here in the Central

22   District on two other cases.

23      Q.   And that was *United States v. Hampton* and *United*

24   *States v. Hickman*; is that right?

25      A.   Yes.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1     Q.  And both of those, I believe, were in 2022; is

2  that right?

3     A.  I believe so, yes.

4     Q.  And both of those cases, those were both in

5  front of Judge Myerscough?

6     A.  That's correct.

7     Q.  And you were found to be an expert in the area

8  of drug trafficking, correct?

9     A.  Yes.

10     MS. SEBERGER:  Your Honor, at this time, I tender

11  Special Agent Robinson to the Court as an expert in

12  drug trafficking.

13     THE COURT:  Mr. Patton?

14     MR. PATTON:  No objection, Your Honor.

15     THE COURT:  I will accept.

16  BY MS. SEBERGER:

17     Q.  Special Agent Robinson, I'm going to try and --

18  again, to make this go a little bit faster -- focus on

19  a couple specific areas.  First, as it relates to this

20  particular case, can you briefly explain what your role

21  was?

22     A.  Yes.  As a DEA Task Force Officer, I was

23  contacted after the stop had already been made and

24  subject had already been arrested.  And I was just

25  given some details about the cases.  This would be what

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    the DEA would call an *adoption case*.  I was actually --

2    I believe I was on leave whenever it happened, and

3    another Task Force Officer in my group was handling the

4    case.

5        Q.  So your role then kind of at that point is

6    you're sort of the case agent.  You're kind of

7    shepherding it through that adoption process that you

8    described?

9        A.  Correct.  Once I came back, I just started

10   helping with evidence, moving it back and forth from

11   the Illinois State Police and DEA, and just small

12   things like that.

13       Q.  So from your role and your role as an expert,

14   you've reviewed police reports and interviews and other

15   evidence in this case, correct?

16       A.  Yes.

17       Q.  And based on your review of the that, I want to

18   ask you about a couple particular points.  First, if

19   you could briefly describe for us some general indicia

20   that someone's engaging in drug trafficking, based on

21   your training and experience?

22       A.  Yes.  Somebody would be moving typically larger

23   amounts of narcotics across State lines.  And it can

24   vary from person to person, but there's a lot of the

25   same characteristics of what I would consider someone

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

 1   who's trafficking narcotics that appear regularly.

 2       Q.   And what are those characteristics?

 3       A.   Someone who is doing it professionally, whose

 4   just a -- I guess a -- are you looking for a *trafficker*

 5   versus *smuggler*?

 6       Q.   So taking a step back, I'm looking for, at this

 7   point, indicia of someone who is engaged in drug

 8   trafficking.  What are those items that you might find

 9   that would give you a clue that they might be engaged

10   in drug trafficking?

11       A.   Yeah.  Handguns, bags, scales, cutting agent,

12   and then whatever amount of narcotics, depending on

13   what level of dealer they would be.

14       Q.   And then I kind of -- we're going to -- again,

15   kind of moving quickly here, I want to ask you to

16   explain a term for us.  What's a *drug mule*?

17       A.   Drug mule would be what I referred to earlier as

18   a smuggler.  That is someone who is basically hired by

19   the drug dealer to transport, typically, a larger

20   amount of narcotics to a specific place and/or person.

21       Q.   And are there certain characteristics, based on

22   your training and experience, that would differentiate

23   someone who is a mule versus, you know, the person who

24   hired them or sort of a regular drug dealer and drug

25   trafficker?

1   A.  Yes.  Someone who would be considered to be a

2   mule would have little to no information about exactly

3   what was going on.  They would be given an amount of

4   narcotics; sometimes it's known to them and sometimes

5   it's not.  It's typically stored in a place hidden

6   within the vehicle that is not easily accessible.  And

7   they are told to drive from point A to point B,

8   wherever that would be.  And then they would get

9   instructions along the way, or they might already have

10  the instructions ahead of time.

11  Q.  Is there anything noteworthy to you based on

12  your training and experience about what vehicle a mule

13  might drive?

14  A.  Yeah.  Typically, it would be a vehicle with a

15  good registration, kind of blends in, and doesn't look

16  like it -- you don't want to stick out whenever you're

17  trafficking or smuggling a large amount of narcotics.

18  So just a vehicle that would be *clean*, I guess, is what

19  we use to describe it.

20  Q.  Would a mule be able to -- I'm going to use the

21  phrase, I guess, *test* or *quality control* the product

22  they're moving?

23  A.  No.  They're expected to be somebody who is --

24  has all their -- you know, they're in the best frame of

25  mind to drive and transport something.  So they're able

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    to use their blinker.  They're able to -- basically,

2    not get stopped by law enforcement is the main goal, so

3    you want somebody who's very clearheaded and can get

4    from point A to point B without drawing too much

5    attention to themselves for whatever reason that may

6    be.  Typically, people who are using drugs aren't the

7    best candidate for that.

8        Q.  In your training and experience, are

9    higher-level drug traffickers typically okay with

10   someone moving their product, I guess, dipping into

11   that stash of product?

12       A.  No.

13       Q.  Now, I do have a question about this particular

14   case, the amount of substance involved in this case.  I

15   believe it ultimately is approximately 197.0 grams.  Is

16   that noteworthy to you for any reason?

17       A.  Yes.  It's -- it would be -- I mean, you could

18   describe it as a large amount to some people.  But for

19   someone to smuggle, that amount to me isn't very large.

20   Most people who are sending mules to drive narcotics

21   from point A to point B are going to make it worth

22   their time.  So they don't want to send a few hundred

23   grams; they want to send pounds or more is the most

24   common for what I see for legitimate mules and

25   smugglers.

```
 1      MS. SEBERGER:  I have nothing further at this time,
 2   Your Honor.
 3      THE COURT:  Thank you.
 4        Mr. Patton?
 5                    CROSS-EXAMINATION
 6   BY MR. PATTON:
 7      Q.  Agent, you do controlled buys?
 8      A.  Yes, sir.
 9      Q.  You do meth controlled buys?
10      A.  Yes.
11      Q.  And for the area that you cover here in Central
12   Illinois, like, what's a typical amount of user amount
13   of meth that somebody's going to buy?
14      A.  A user amount that somebody is going to buy, I
15   mean, if it were to be someone who's strictly a user,
16   they would buy it in a gram amount.  I mean, less than
17   ten.
18      Q.  Somewhere between 1.0 gram and less than 10.0
19   grams?
20      A.  Five, yeah.
21      Q.  And for how much?
22      A.  Just depends on the dealer and who they're
23   selling to.  That's a very wide array of prices there.
24      Q.  But, you know, in your direct examination, you
25   gave a whole lot of, well, generally, this is this and,
```

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

```
 1   generally, that's that.  So generally, what's the cost
 2   to get, you know, a gram of meth around here?
 3       A.  It can be anywhere from $90 to $120.
 4       Q.  Okay.  And so 100 -- for 90 to 100 bucks, is
 5   that for -- that's per gram?
 6       A.  Per gram of that substance, correct.
 7       Q.  Okay.  And you said for somebody who's a mule,
 8   they're moving stuff from point A to point B, right?
 9       A.  Correct.
10       Q.  And oftentimes, they don't know a lot of
11   information?
12       A.  That's correct.
13       Q.  And that's intentional, right?  Because the
14   person that's using the mule doesn't want the mule to
15   have the information so they can't rat them out if the
16   mule gets caught, right?
17       A.  Yes.
18       Q.  That's kind of the point of using the mule,
19   right?
20       A.  Correct.
21       Q.  The dealer doesn't want to, him or himself, take
22   the risk of getting caught while they're driving and
23   transporting it, having a search, and having the stuff
24   found on them, right?
25       A.  Correct.
```

1      Q.  And so you said it's often the person -- the
2  mules given a little bit of information, and oftentimes
3  might just have to get further instructions while
4  they're actually traveling?
5      A.  Correct.
6      Q.  So that -- you know, they may not even know,
7  ultimately, where -- exactly where they're going when
8  they take off?
9      A.  Yes.
10     Q.  All right.  And they may have to -- once they
11 get close to a general area -- have to check in and get
12 more specific information about where specifically
13 they're supposed to go and who they're supposed to
14 meet?
15     A.  Correct.
16     Q.  Okay.  And so you said you reviewed the
17 discovery in this case in preparing for testifying; is
18 that right?
19     A.  Yes, sir.
20     Q.  All right.  So there's -- let's just say --
21 roughly 200.0 grams; right, of pretty much pure meth?
22     A.  Yes.  That's a fair assessment.
23     Q.  Like 94, 95 percent pure.
24         All right.  And from your training with the DEA,
25 you're aware that these days, that meth is coming from

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1  Mexico across the border in massive amounts, right?

2      A.  Correct.

3      Q.  And so you -- the local homegrown cooking

4  doesn't happen too much anymore; does it?

5      A.  It's pretty rare now.

6      Q.  And if somebody is doing -- cooking it that way,

7  they're not getting 94, 95 percent pure meth, right?

8      A.  No, sir.  Not even close.

9      Q.  So the reality of today's meth trade is that

10  very large *transnational organizations* -- I believe is

11  what the DEA labels them -- are making the meth in

12  Mexico and just smuggling it across, right?

13      A.  Yes.

14      Q.  All right.  So in your opinion, would this 200.0

15  grams of almost pure meth most likely have started off

16  somewhere outside the United States and made its way

17  across the border, right?

18      A.  Yes.

19      Q.  And then down a certain number of steps on the

20  distribution ladder before it got found on

21  Interstate 55 with Mr. Wilkinson, right?

22      A.  Correct.

23      Q.  So do you have any idea of how many rungs down

24  the ladder that came from the time the stuff came

25  across the border?

1    A.  It would be a very difficult question to answer.

2    Q.  When it's coming across, it's probably coming

3  across in hundreds of pounds or hundreds of kilos,

4  correct?

5    A.  It can be.

6    Q.  And then once it gets across the border, just

7  distribution channels are in place that get it

8  basically throughout the entire country these days,

9  right?

10    A.  Yes.

11    Q.  So did you do any review of Tom's background and

12  finances as to where in the world he'd come up with --

13  if it's 100.0 grams -- 100 bucks a gram and he's got

14  200.0 grams -- what? -- we're talking $200,000 worth of

15  meth.  Where'd he get the money to try and purchase

16  that?

17    A.  I did not do any research into his background,

18  no, sir.

19    Q.  Okay.  And, you know, if probation found he has

20  literally zero assets and outstanding bills, so he's

21  got a negative net worth, any idea where he'd come up

22  with the money to stake this?  Like, hey, I'm going to

23  get my hands on a couple hundred grams of pure meth as

24  a money-making deal.

25    A.  As you described before, the amount of meth

1    coming across the border right now is an incredible

2    amount and that leaves a lot of dealers with, I guess,

3    some room to maybe give it to someone on the -- what we

4    would call -- *on the front*.  And that would mean that I

5    would give you a specific amount of meth with the idea

6    that you don't have the money now, but you will

7    eventually pay me back whether it's because you're

8    scared of me or because you're just -- you know, you

9    owe me money and will pay me back.

10         And then also, selling -- to say you have 200.0

11   grams of meth and to say someone's going to charge them

12   $100 for all 200.0 grams of that, that's very uncommon.

13   Typically, the higher amount you buy, you get a price

14   break.  It's like shopping at, you know, a big bulk

15   store versus shopping at somewhere small.

16     Q.  In your opinion, do dealers that have access to

17   several hundred grams or more of meth generally front

18   that meth to somebody who's a meth addict?

19     A.  Like I said, there is a large amount of meth

20   right now.  It is pretty easily accessible.  Some

21   dealers will strictly stay away from those people, and

22   some dealers will stick with those people because they

23   know them or some other reason.

24     Q.  And in your review of this case, did you watch

25   the video of Mr. Wilkinson's interview after he was

1  arrested?

2      A.  No, sir.

3      Q.  Did you read the report detailing the interview?

4      A.  Yes, sir.

5      Q.  Okay.  And then you saw in the report that Tom

6  told them that he got the meth from a guy he knew as

7  *LB*, right?

8      A.  Yes.

9      Q.  In the St. Louis area?

10     A.  Yes.

11     Q.  And he offered to let the agents get LB's number

12  from his phone so they could, you know, try and work

13  backwards, correct?

14     A.  I believe so.

15     Q.  And Tom offered to physically take agents to

16  where he got the meth to show where -- to show them

17  where he got it, correct?

18     A.  I believe so, yes.

19     Q.  Okay.  Nobody followed-up on those offers,

20  right?

21     A.  Not that I'm aware of.

22     Q.  So you could have tried taking steps to try and

23  confirm that, yeah, LB, his number is in my phone to

24  contact the guy.  He's like, this is my guy.  But you

25  didn't, right?

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    A.  I'm not aware of if the other group -- there's

2   another Illinois State Police group that works that

3   specific area more heavily than what I would.  And I'm

4   not sure if they spoke with your client or not.  And if

5   I -- if they did, that wouldn't necessarily be reported

6   on, depending on his level of cooperation.  And your

7   level of cooperation in the middle of the night when

8   you get traffic stopped can be very different than the

9   next day when someone comes to talk to you.

10    Q.  Well, there was another agent beyond the State

11   Police trooper who did the stop who was there during

12   the evaluation, right?

13    A.  I don't recall who exactly was in the room other

14   than the specific trooper who made the stop and just --

15    Q.  I don't know the guy's name because it's not in

16   here anywhere, but there's another guy there.  So you

17   don't know who it was?

18    A.  No, sir.

19    Q.  And you didn't watch the video to watch him tell

20   Tom, *yeah, that's St. Louis; I don't cover that area*?

21    A.  No, sir.  I did not watch the video.

22    Q.  But, you know, at no point that you're aware of

23   did anybody say, hey, we're interested in maybe trying

24   to follow-up and see who the supplier was for this

25   amount?

1      A.  Not that I'm aware of.

2          I know the Illinois State Police has -- there's

3   sometimes issues with working with someone who has

4   been -- or is being charged with driving under the

5   influence.  That would be, like, a crime that we tend

6   to stay away from.

7      MS. SEBERGER:  Your Honor, can I object at this

8   point?  Can we have a brief sidebar at this particular

9   point?

10     THE COURT:  Yes, you may.

11                *(Sidebar at the bench.)*

12     MS. SEBERGER:  Here's my issue, Judge, and my

13  objection.  As the Court's aware, Mr. Patton's

14  obviously the second attorney.  I talked with

15  Ms. Pollock.  I'm in a tricky position here because,

16  obviously, under the Federal rules, Your Honor's not

17  involved in plea negotiations.

18     THE COURT:  Correct.

19     MS. SEBERGER:  However, based on this line of

20  questioning, I feel like I need to point out that

21  Ms. Pollock and I had discussions about cooperation.  I

22  don't know to what level Mr. Robertson would be aware

23  at all, quite frankly.  So I don't know that he can

24  answer these particular questions down this line, and I

25  was just trying to --

1    MR. PATTON:  And I will -- I'm just asking based on

2  what we're -- based on what Mr. Wilkinson told him that

3  night when he was getting interviewed and the offers he

4  made of what he offered to do that night to follow-up.

5    THE COURT:  And you're talking about not as much

6  about cooperation, but what his knowledge would be as

7  it goes to --

8    MR. PATTON:  Right.

9    MS. SEBERGER:  So I don't think it's a big issue.  I

10  just didn't want to --

11    MR. PATTON:  And I've beaten it enough.  I'll move

12  on.

13    THE COURT:  Okay.  Thank you very much.

14              *(In open court.)*

15    THE COURT:  You may proceed, Mr. Patton.

16  BY MR. PATTON:

17    Q.  And so, Agent, I believe your testimony on

18  direct was that 197.0 grams, 200.0 grams of meth really

19  isn't that large of an amount of drugs being

20  trafficked?

21    A.  Yeah.  Yes, as far as being smuggled.

22  *Trafficked* versus *smuggled*, it's the two words that get

23  people caught up.  But, yes.

24    Q.  Okay.  So it's -- in terms of the total quantity

25  of methamphetamine being brought into the country,

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    obviously, 200.0 grams is not that much?

2       A.   Correct.

3       Q.   Okay.   And even based on what you're seeing

4    around here, I think you made a comment several times

5    that there's so much meth available that you all in

6    your Central Illinois Enforcement Group wouldn't rank

7    this as a large amount?

8       A.   No.

9       MR. PATTON:   All right.   Those are my questions,

10   Your Honor.

11      THE COURT:   Thank you.

12         Ms. Seberger?

13      MS. SEBERGER:   Yes, Your Honor.

14                     REDIRECT EXAMINATION

15   BY MS. SEBERGER:

16      Q.   Special Agent, I just want to start by

17   addressing the interview.   In your experience, can you

18   take everything someone says in an interview at face

19   value?

20      A.   No.

21      Q.   And, in fact, if someone would have offered

22   conflicting stories during an interview, would that

23   then tend to discredit, perhaps, their claim that they

24   were just trafficking drugs for someone named LB?

25      A.   Yes.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    Q.  And is something like that a reason why an

2    officer may or may not decide to follow up on a claim?

3    A.  Yes.

4    Q.  And then the other area I want follow up on is

5    you talked briefly about someone who fronts drugs, and

6    Mr. Patton offered you that Mr. Wilkinson doesn't have

7    a lot in the way of assets.  Does that surprise you of

8    someone who is a drug trafficker?

9    A.  No.

10   Q.  Does that, in any way, influence, I guess, your

11   opinion -- or I'm sorry.

12   MS. SEBERGER:  If I could have one moment?

13   THE COURT:  That's fine.

14   BY MS. SEBERGER:

15   Q.  Would that particular characteristic influence

16   your opinion on whether or not someone was a mule

17   versus a trafficker?

18   A.  Um.

19   Q.  I don't know if that was the best question I've

20   ever asked.  Do you understand what I'm asking?

21   A.  One more time, if you could.

22   Q.  So someone not having assets or in

23   Mr. Wilkinson's case, having very few assets, is that a

24   characteristic that you'd look at in determining

25   whether or not someone is a mule versus a trafficker or

1    dealer themselves?

2    A.   No.

3    MS. SEBERGER:   That was all I had, Your Honor.

4    THE COURT:   Thank you, Ms. Seberger.

5    MR. PATTON:   I have no follow-up, Your Honor.

6    THE COURT:   Thank you.   You may step down.   Thank

7    you very much.

8                    *(Witness excused.)*

9    MR. PATTON:   Your Honor, we'd just stand by the

10   objection that we lay out in our commentary.

11   Mr. Wilkinson is, obviously, at the bottom rung of the

12   distribution food chain.   He's, unfortunately, a man

13   that got addict-- his addiction got triggered again.

14   He's desperate; he needed to make some money.   As he

15   explained to the police, he's getting paid a couple

16   hundred bucks.

17        He's unfortunately -- you know, his addiction

18   is so bad that he's driving a stolen car, you know,

19   while, you know, high on meth, which is, obviously, not

20   a good idea whether you have other meth in the car or

21   not.

22        But I think it shows this is the type of person

23   that minor participant is looking at.   Someone is using

24   him to take the risk of running this couple hundred

25   grams.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1          Which I get, you know, the agent's saying it's

2     not a large amount, and I don't challenge that at all.

3     Unfortunately, we are awash in methamphetamine.

4          But we think that, you know, the test -- we lay

5     out the factors Your Honor has to consider; they're

6     there.  At bottom, it is a

7     totality-of-the-circumstances test to look at it all

8     and make a, you know, qualitative judgment.  Is

9     Mr. Wilkinson substantially less culpable than the

10    others?

11         Now, it's tougher in these mule-type cases

12    because you don't catch the other people because the

13    mule system works.  You use somebody who doesn't know

14    anything to transport it so that when they get caught,

15    they can't tell you anything.  I mean, it's the whole

16    point.

17         And the agent's testimony about how the mules,

18    they're given limited information -- you know,

19    sometimes they don't even know where they're going.

20    They have to call and get more information during the

21    trip; that's exactly what Mr. Wilkinson said he had to

22    do.  When he told the trooper as he got closer to the

23    Lincoln area, he was supposed to call LB, and LB would

24    give him further instructions on where exactly he was

25    supposed to go and how things were supposed to go down.

1          And, you know, I would submit that the idea that

2    this was a front situation isn't particularly credible.

3    You know, drug dealers aren't stupid.  You know, to

4    front this level of meth to somebody who has their own

5    addiction -- I mean, you give 200.0 grams to a meth

6    addict and say, oh, yeah; don't snort it all; you know,

7    sell it and give me the profits.  I just don't think,

8    you know, that's very likely.

9          So we would submit that the evidence that's in

10   front of you supports a finding that Mr. Wilkinson was

11   substantially less culpable than the person who was the

12   source of the 200.0 grams and the person that was going

13   to get that money, sell it, make -- you know, whatever

14   the profit margin was going to be from what he was

15   buying it at the wholesale.  And I, you know, get what

16   the agent is saying.

17         When you look at all those factors together,

18   he's a minor participant.  And although it doesn't

19   impact the ultimate guideline range because he's a

20   career offender, we'd ask that you make that finding so

21   that when you're then deciding, hopefully, to give a

22   sentence below the career offender guideline, you would

23   have an accurate comparator of what the guideline would

24   be without the career offender enhancement.

25         THE COURT:  Thank you very much.

1          Ms. Seberger, would you like to argue as well?

2      MS. SEBERGER:  Yes, Your Honor.

3          I'm not going to -- to at this point start

4   going down the career-offender path.  So just

5   briefly --

6      THE COURT:  Correct.  You will have your time to do

7   that.  So go ahead.

8      MS. SEBERGER:  I assumed.

9          Your Honor, I just want to touch on a couple

10  things.  The government has never said and in no way

11  I'm saying -- I think my own expert I brought in here

12  did not, you know, try to make Mr. Wilkinson out to be

13  the Sinaloa Cartel.

14         However, this particular guideline enhancement

15  is looking at someone who, you know, is literally --

16  and kind of like the agent described -- a mule who is

17  just moving from point A to point B.  And I recognize

18  that the defendant made some self-serving statements in

19  his interview; all be it, inconsistent ones, which did

20  not merit further review because they didn't make a lot

21  of sense.

22         And, Your Honor, I also want to go ahead and at

23  this point make sure I head off this idea that drug

24  dealers don't front drugs to drug addicts.  As the

25  special agent explained, we see it all the time.  This

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    is somebody who's going to engage in this type of

2    criminal behavior because there's not a lot for them to

3    lose.

4         So, Judge, this guideline isn't just looking at

5    whether or not we've trickled down to what the defense

6    is going to call a *low-level drug dealer*.  It's looking

7    at what his particular role in this particular offense

8    was.  And this was a defendant who had an amount of

9    product not indicative of a mule, who had the autonomy

10   to perform quality-control testing, essentially.  He

11   explains that he had to check and see if it was good.

12   That's not the kind of autonomy a mule is going to

13   have.  If a mule dips into this, you know, carefully

14   packaged hidden stash of product and everything doesn't

15   show up at the destination, they're going to be

16   significant consequences.

17        However if someone who's arranged the drug deal

18   themselves dips into the product and checks to see if

19   it was good, we're not talking about the same set of

20   circumstance.  So when you look at some of the

21   characteristics Special Agent Robinson talked about in

22   terms of a mule, we don't see many of them here.

23        What we see instead is someone who has baggies,

24   a firearm, and sort of a *middle amount* -- is what I'll

25   call it -- of drugs; not indicative of mule

1   trafficking, but indicative of someone who's making a

2   drug deal in Lincoln.

3          And I would also note that during that

4   interview -- and I don't think I mentioned this before.

5   And if I could have just one moment because I want to

6   make sure it's in the PSR?

7       THE COURT:  Take your time.

8              *(Pause in proceedings.)*

9       MS. SEBERGER:  Yes.  I direct the Court to

10  paragraph 15.  And the defendant initially says he's

11  going to Lincoln to meet his girlfriend.  So is what we

12  have here a defendant who really didn't know where the

13  drugs were going to end up?  Or is this a defendant who

14  thinks knowing people in the area, had seen an

15  opportunity to change his lack of assets and make some

16  money by selling methamphetamine?

17         I think looking at the totality of the

18  circumstance, what's far more likely is that this

19  defendant was not a minor participant, but was in fact

20  trafficking drugs from Missouri to Illinois.

21         I do recognize, however, that, ultimately,

22  because the defendant is a career offender, it doesn't

23  have a large impact.  But I wanted to make sure I got

24  to the Court some general information on minimal

25  participant and on drug mules.  And so I appreciate --

```
 1   and sorry for belaboring the point.
 2      THE COURT:  And please do not apologize.  You guys
 3   have all the time that you need in this hearing today.
 4   So you do not have to apologize if things go a little
 5   bit longer than you had anticipated, but I appreciate
 6   it.
 7          Mr. Patton, anything else?
 8      MR. PATTON:  No, Your Honor.
 9      THE COURT:  All right.  So I've now had the ability
10   to consider the evidence that has been presented as
11   well as the arguments of counsel as to defendant's
12   objection to paragraph 35.  And as we've identified,
13   the defendant objects to not receiving a two-level
14   reduction to the total offense level for being a minor
15   participant under Guideline Section 3B1.2(b).
16          Defendant states that he was recruited to drive
17   a quantity of methamphetamine from St. Louis to Lincoln
18   in exchange for $200 to $300 and methamphetamine for
19   his personal use.  He claims that the dealer used him
20   as a drug mule to protect himself from the risk of
21   transporting the drugs himself.  Defendant, thus,
22   alleges he is substantially less culpable than the
23   other individuals engaged in the same offense.
24          The commentary to the guideline notes that this
25   section provides a range of adjustments for a defendant
```

1    who plays a part in committing the offense that makes

2    him substantially less culpable than the average

3    participant in the criminal activity.  The commentary

4    further provides that the determination of whether to

5    apply an adjustment is based on the totality of the

6    circumstances and largely depends on the facts of the

7    case.

8              The factors that I would consider in making and

9    have considered in making a determination include:

10   Number 1, the degree to which defendant understood the

11   scope and structure of the criminal activity; 2, the

12   degree to which the defendant participated or planned

13   the criminal activity; 3, the degree to which defendant

14   exercised decision-making authority or influenced the

15   exercise of decision-making authority; number 4, the

16   nature and extent of defendant's participation in the

17   commission of the criminal activity, including the acts

18   defendant performed and the responsibility and

19   discretion defendant had in performing those acts; and

20   number five, the degree to which defendant stood to

21   benefit from the criminal activity.

22             For example, a defendant who does not have a

23   proprietary interest in the criminal activity and who

24   was simply being paid to perform certain proprietary

25   tasks should be considered for an adjustment under the

1    Guidelines.  And the fact that a defendant performs an

2    essential or determinative role in the criminal

3    activity is not determinative.  Such a defendant may

4    still receive a downward adjustment if he or she is

5    substantially less culpable than the average

6    participant in the criminal activity.

7        As everyone knows, it's the defendant's burden

8    to prove that a reduction applies by a preponderance of

9    the evidence.  In the *United States v.*

10   *Sandoval-Valezco*, which is a Seventh Circuit 2013 case,

11   the defendant acted primarily as a courier for a

12   Mexican drug-trafficking organization in Chicago and

13   claimed he was entitled to a minor role reduction.  The

14   district court found his intimate and substantial

15   connection to large quantities of drugs to be

16   indicative of the significance of his role.

17       Citing paragraph 21 of the PSR, the government

18   states that the defendant would appear to be more than

19   a courier, as he stated that, "I had to check to see if

20   it was good."

21       The government notes that a courier -- and

22   argued today -- the government argued that a courier

23   would not have the autonomy to quality control the

24   product in that manner.  However, the defendant made

25   that statement in response to the trooper's question

1    about when he had last used methamphetamine.  And after

2    informing the trooper he had been paid in part with

3    methamphetamine, defendant's full statement in response

4    was, in quotes, "I smoked when he gave me the stuff

5    about an hour ago.  I had to check to see if it was

6    good."  A plausible interpretation of that statement is

7    that defendant might have been checking to see if the

8    methamphetamine was good for his own benefit in order

9    to determine if he had been properly compensated, not

10   because he had a significant role in the criminal

11   activity.

12          The government also notes that officers found in

13   defendant's car several small plastic baggies, which

14   are often used by drug-traffickers, which suggests he

15   wasn't a minor participant.

16          Additionally, the defendant initially lied about

17   the 9mm semi-automatic firearm before admitting he

18   received it from the individual who paid him to drive

19   the approximately 187.4 grams of methamphetamine from

20   St. Louis to Lincoln.

21          The government states that the defendant told

22   multiple stories to officers and now asks the Court to

23   credit the one that is most self-serving, that he is

24   merely a mule.

25          The defendant initially claimed that he did not

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    touch the gun until he was pulled over, but later told

2    officers that he had taken the gun apart and reloaded

3    it -- reloaded the firearm that day.

4         Now the government maintains that while

5    defendant has been telling self-serving stories since

6    the beginning of the traffic stop, the physical

7    evidence reflects the defendant was the sole

8    participant engaged in drug distribution.

9         In his commentary, defendant states that he

10    offered to let the police officers find the phone

11    number of the man who paid him to deliver the

12    methamphetamine; though, he declined to give them

13    permission to search the entire phone.  Defendant also

14    offered to take the officers to the location in

15    St. Louis where he met the man and received the

16    methamphetamine.

17         The commentary further states defendant,

18    obviously, lacked the means to obtain almost 200.0

19    grams of methamphetamine to traffic for profit.

20         For these reasons, the defendant states he's

21    clearly being used as a drug mule so that the

22    trafficker could shield themselves from law

23    enforcement.  That explains why he did not have

24    detailed information about the supplier and purchaser

25    of the methamphetamine.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1          Here, it is clear that the parties have a

2   dispute as to the origin and the source of the drugs.

3   The defendant's account that he was merely a drug mule

4   is certainly plausible.

5          At the same time, the presence of the plastic

6   baggies, the firearm, and the changing stories might

7   otherwise suggest that he was more than a mere -- or a

8   minor participate.

9          But based on the evidence that was presented

10  today, the arguments, and after my review of the

11  arguments and the commentary, and considering the

12  totality of the circumstances, I find that the

13  defendant has met his burden by proving a preponderance

14  of the evidence that the reduction applies.  Therefore,

15  the defendant's objection as to paragraph 35 is

16  sustained.

17         Now we'll move to defendant's objections to

18  paragraph 68 through 78, 80, and 81.

19         Is there any further argument that needs to be

20  made as to those objections, Mr. Patton?

21    MR. PATTON:  Your Honor, I just wanted to highlight

22  that it is the probation's custom in this district to

23  include that information.  And with the idea that,

24  well, we have to put the defendant's criminal record in

25  there and we just -- and the statute that says, you

```
 1   know, there's no limit on what the Judge can consider

 2   at sentencing, that's a bit of a misleading statement

 3   because there is a limit.  The limit is, you know, that

 4   it has to -- the information has to be reliable, and it

 5   has to be proven by a preponderance of the evidence.

 6          And I -- it is our position that when it is --

 7   when the government doesn't intend to offer or the

 8   probation hasn't gone and gathered any evidence to show

 9   that any of these -- this other criminal conduct that

10   either resulted in arrests -- or sometimes it's just

11   arrests; sometimes it's arrests and charges that got

12   dismissed.  That when there's no evidence to support

13   any of that -- and I am not knocking anybody for not

14   going out and getting it because I know that wasn't the

15   purpose of why the probation office put in there; I get

16   that.  So it's -- I'm not saying that they should have

17   went out and tried to get it.  But then the question

18   is:  Well, then why was it there?  Right?

19          If we're going to say, hey, the fact that

20   somebody got arrested doesn't establish by a

21   preponderance of the evidence that they actually did --

22   committed the offense that they were arrested for -- or

23   if charges were filed and then were dismissed and

24   there's no other evidence to prove up even by a

25   preponderance that the person engaged in any activity,
```

1    let alone what they were charged with, so that

2    Your Honor couldn't rely on it because there's not been

3    any evidence put in to support it, then what -- what

4    purpose is it there for?

5            And the only thing I can see it doing is trying

6    to convince the Judge, well, you know, where there's

7    smoke, there's fire.  And, you know, even if the Judge

8    says, *no, I'm not doing it*, well, you've read it.  It's

9    in your mind.

10           Now, I'm not saying that, you know, you would --

11   you'd consciously or unconsciously do it, but it's just

12   like what is it doing there?  And it would be -- so

13   that's why we're objecting to it.

14           And we'd love to see a rule moving forward

15   that -- I just don't want to see stuff that's arrests

16   or charges that have been dismissed, unless there's

17   some evidence backing it up.  Because otherwise, it has

18   no business being presented as any part of a sentencing

19   hearing because it doesn't have any reliability and,

20   therefore, any relevance.

21           And I want to clarify, I think the paragraph

22   numbering might have changed from when I sent the

23   letter to the probation officer in the addendum to the

24   final --

25       THE COURT:  Yes.  Please identify --

1      MR. PATTON:  It's paragraph 68 through 78 and those

2   are all under the *other criminal conduct* heading.

3      THE COURT:  Okay.

4      MR. PATTON:  And then paragraph 80, which is other

5   arrests.  And there is another paragraph to that, 81,

6   but that was the arrest in this case.  And we know he

7   was arrested in this case, and he's pled guilty in this

8   case.

9      THE COURT:  So we can consider 81?

10     MR. PATTON:  Yes.  So it would be 68 through 78 and

11  80.

12     THE COURT:  All right.  So noted.  Thank you very

13  much, Mr. Patton.

14        Ms. Seberger?

15     MS. SEBERGER:  Your Honor, I guess I have two points

16  to make, essentially.  The first point is, frankly, in

17  this particular case, I'm not planning on spending a

18  ton of time talking about his other arrests.  But I

19  think I'm also put in the position of having to respond

20  to the general policy argument.  And it's quite clear

21  in the law, as Mr. Patton outlined, that the statute

22  provides that there is no limitation on the information

23  concerning the background, character, and conduct of a

24  person convicted of an offense which a Court of the

25  United States may receive and consider for the purpose

 1    of imposing an appropriate sentence.  And that's
 2    18 U.S.C. Section 3661, and Mr. Patton already made
 3    reference to it.
 4            We also know that Courts have said that
 5    Your Honor can consider a substantial history of
 6    arrests in looking at the pattern of someone's criminal
 7    activity and criminal behavior.
 8            So what I'm really doing is standing here and
 9    perhaps not in as good of a position as the Federal
10    Defender as just an AUSA of having to make a policy
11    argument to this Court.  But as a representative of the
12    Government, the law indicates that the Court can
13    consider this if this is relevant to you.  And I make
14    this point not even necessarily as it relates to
15    Mr. Wilkinson, but just to indicate that in other
16    cases, quite frankly, this is something that the Court
17    can consider, and it may be relevant in some particular
18    circumstances.
19            As it relates to Mr. Wilkinson, I don't think
20    there's anyone contesting he has a long history of
21    drug-related offenses and drug-trafficking-related
22    offenses.  I don't think we need to consider these
23    paragraphs to get to that conclusion.
24            So, Judge, I disagree with the defendant's
25    objection because the law, the Sentencing Guidelines,

1   and the case law, all indicate the Court can consider

2   these particular items.  Ultimately, as to whether or

3   not the Court in this case does, I defer, obviously, to

4   Your Honor.

5       THE COURT:  Thank you.

6           As to the defendant's objection to paragraph 68

7   through 78 as well as 80, which consists of charges

8   that were either dismissed or not even filed,

9   defendant's commentary and argument notes that

10  defendant has a due process right to be sentenced based

11  on accurate information.  And any information relied

12  upon by the Court must bear a sufficient indicia of

13  reliability to support its probable accuracy.  The

14  defendant further claims there's no point in including

15  the information in the PSR.

16          Certainly, the defendant is correct that the

17  bear assertion alone that defendant committed a crime

18  is not sufficiently reliable to support a finding that

19  he actually committed a crime.  However, the

20  information as part of defendant's background and

21  history -- and Ms. Seberger has correctly identified --

22  it is something that the Court may rely upon.

23          Now, in any event, this objection does not have

24  any bearing on the statutory penalties or the

25  guideline -- guideline range in this case.  The Court

1    finds under Federal Rule of Criminal Procedure

2    32(i)(3)(B) that a ruling is unnecessary because the

3    matter will not affect sentencing, and the Court is not

4    considering the matter in sentencing in this case.

5          Having ruled on that objection as well as the

6    other objections, I then adopt the factual findings of

7    the revised PSR as my own.

8          So at this time, we'll go to the objections to

9    the supervised release conditions.  And on April 26,

10    2023, the Court filed its proposed conditions of

11    supervised release and its justification for those

12    conditions.

13          Mr. Wilkinson, have you had the ability and

14    sufficient time to go over the proposed conditions and

15    justifications with your counsel, Mr. Patton?

16       THE DEFENDANT:  Yes, ma'am.

17       THE COURT:  Thank you.

18          And I want to let you know that the failure to

19    object at this time may result in waiver of any

20    objection to the conditions of supervised release on

21    appeal.  Do you understand that?

22       THE DEFENDANT:  Yes, ma'am.

23       THE COURT:  And do you have any objections to those

24    conditions?

25       THE DEFENDANT:  No, ma'am.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1      THE COURT:  All right.  And there were also --

2   Mr. Patton, did you have sufficient time to go over the

3   proposed discretionary conditions with Mr. Wilkinson?

4      MR. PATTON:  Yes, Your Honor.  We went over the

5   conditions and the reasons Your Honor gave for imposing

6   the conditions.

7      THE COURT:  And you don't have any objections to

8   those, correct?

9      MR. PATTON:  That is correct.  And we would waive

10   the Court's reading of them in open court.

11      THE COURT:  Wonderful.

12        And, Mr. Wilkinson, it's my understanding that

13   I have been provided the conditions of supervised

14   release, which you have initialed as well as signed; is

15   that correct?

16      THE DEFENDANT:  Yes, ma'am.

17      THE COURT:  Thank you very much.

18        Ms. Seberger, government doesn't have any

19   objection, correct?

20      MS. SEBERGER:  No, Your Honor.

21      THE COURT:  All right.  And at this point then, I

22   will provide these to the clerk, as there is no

23   objection to the conditions and Mr. Wilkinson has

24   properly reviewed and understands those.

25        Thank you.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1          Now as to the calculations at issue, according

2    to the PSR, Mr. Wilkinson's base offense level as to

3    Count 1 would be 32 with the two-point reduction for

4    the minor role.  And the adjusted offense level as to

5    Count 1 becomes 30.  And that had to do with Count 1,

6    the possession with intent to distribute 50.0 grams or

7    more of methamphetamine.

8          Now as to Count 3, the felon in possession of a

9    firearm, Mr. Wilkinson's base offense level and

10   adjusted offense level is 24.

11         According to the multiple-count adjustment in

12   determining the combined offense level under Guideline

13   Section 3D1.4, 1.5 units are added to the higher

14   offense level.  When the 1.5 units are added, the

15   offense level is increased by one, resulting in a

16   combined adjusted offense level of 31.

17         There is a Chapter 4 enhancement because

18   defendant has at least two prior felony convictions for

19   either a crime of violence or controlled substance

20   offense; namely, the trafficking in drugs first degree,

21   Saint Francis County, Missouri, Circuit Court Case

22   No. 01CR615827-01; and attempt to manufacture

23   methamphetamine, Saint Francis County, Missouri,

24   Circuit Court Case No. 11SFCR012 -- or I'm sorry,

25   02120-01.  Therefore, defendant qualifies as a career

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    offender.

2          Defendant's offense level is 37, based on the

3    statutory maximum term of imprisonment of life.

4          Under Guideline Section 2K2.4(c), because

5    defendant was convicted of violating Title 18 U.S.C.

6    Section 924(c) and is determined to be a career

7    offender, the guideline range shall be determined under

8    Guideline Sections 4B1.1(c)(2)(A) and (c)(2)(B).  These

9    Guidelines state in a case of multiple counts of

10   conviction and when at least one of the counts is a

11   conviction other than a conviction for Section 924(c),

12   the guideline range shall be a greater of the guideline

13   range that results by adding the mandatory five-year

14   minimum consecutive penalty required by 924(c)

15   (Count 2) to the minimum and maximum of the otherwise

16   applicable guideline range determined for the counts of

17   conviction other than 924(c) count and the guideline

18   range using the table in subsection (c)(3).

19          A total offense level of 34 and a criminal

20   history category of Roman numeral VI would result in an

21   advisory guideline range of 262 to 327 months.

22   Pursuant to Section 4B1.1(c)(2)(A), this would result

23   in an advisory guideline range of 322 to 387 months.

24          So for the record, a two-level reduction for

25   acceptance of responsibility lowers the offense level

1    to 35.

2         Is the government going to move for an

3    additional one-level reduction, Ms. Seberger?

4      MS. SEBERGER:  Yes, Your Honor.

5      THE COURT:  With that reduction, Mr. Wilkinson's

6    total offense level is 34.

7         As stated in paragraph 65, Mr. Wilkinson's

8    criminal convictions result in nine criminal history

9    points, which would result in a criminal history

10   category of Roman numeral IV.

11        I note that paragraph 66 states that he has 12

12   criminal history points, but that appears to be a typo

13   in there.  And because Mr. --

14        Yes, Mr. Patton?

15     MR. PATTON:  Yeah.  I think that it got changed as a

16   result of an objection.

17     THE COURT:  Okay.

18     MR. PATTON:  And that's why it went down to nine.

19   It should be a four.

20     THE COURT:  Okay.  And the record will so reflect

21   that.

22        Because Mr. Wilkinson qualifies as a career

23   offender, defendant's criminal history becomes Roman

24   numeral VI.

25        As stated earlier, a total offense level of 34

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

```
 1   and a criminal history category of Roman numeral VI

 2   would result in a guideline imprisonment range of 262

 3   to 327 months.  When the 60 months are added because of

 4   the Section 924(c) conviction, defendant's guideline

 5   range becomes 322 to 387 months.

 6           Based on the Court's rulings of the

 7   government's objection, the statutory minimum term of

 8   imprisonment as to Count 1 is 15 years.  The maximum

 9   term is life.  The minimum term as to Count 2 is five

10   years, which must be ordered to run consecutive to any

11   other counts, and the maximum is life.  On Count 3,

12   there is no minimum and a maximum term is ten years.

13           The Court is statutorily required to impose a

14   term of supervised release of at least ten years as to

15   Count 1, following the ruling on the objection.  On

16   Count 2, the Court may impose a term of supervised

17   release of not more than five years.  On Count 3, the

18   Court may impose a term of supervised release of not

19   more than three years.

20           The guideline range for a term of supervised

21   release on Count 1 is now ten years.  The guideline

22   range for supervised release on Count 2 is two to five

23   years.  And the guideline range for Count 3 is one to

24   three years.

25           Probation is not authorized because it has been
```

1    expressly precluded by statute.

2         Restitution is authorized under the statute, but

3    there is no identifiable victim of Count 1.  And

4    restitution is not an issue as to Counts 2 and 3.

5         Community restitution may be ordered upon

6    considering the financial resources of the defendant

7    and any other appropriate factors.  The statutory

8    maximum fine is 10 million as to Count 1, and 250,000

9    per count as to Counts 2 and 3.

10        The fine range under the Sentencing Guidelines

11   is 35,000 to ten million.

12        A mandatory special assessment of $100 per count

13   is statutorily required to be imposed.

14        Those are my findings.  Any objections?

15   MS. SEBERGER:  No, Your Honor.

16   THE COURT:  Thank you.

17        Mr. Patton?

18   MR. PATTON:  Other than to finding the 20-year

19   mandatory minimum -- or excuse me, the 15-year on

20   Count 1, no, we don't.

21   THE COURT:  Thank you, Mr. Patton.

22        All right.  Is now -- at this time, any other

23   evidence to be presented or argument only?

24   MS. SEBERGER:  The government would just have

25   argument at this time.

1      MR. PATTON:  Same.

2      THE COURT:  Thank you.

3          Ms. Seberger, you may proceed.

4      MS. SEBERGER:  Thank you, Your Honor.

5          May it please the Court, counsel.

6          Your Honor, we're here, I guess, now this

7  afternoon to talk about holding accountable

8  Thomas Wilkinson for the crime he committed for

9  trafficking methamphetamine from Missouri into

10  Illinois; doing so while under the influence; putting

11  at risk people on Interstate 55, one of nation's

12  busiest highways; and all with a loaded handgun.

13          When you look at the 3553(a) factors, as the

14  Government outlined in our commentary, looking at the

15  seriousness of the offense, this defendant's long

16  history of drug trafficking going from methamphetamine

17  and possession of ingredients used to cook

18  methamphetamine to now trafficking the pure

19  methamphetamine you heard about earlier, and then when

20  considering a sentence that addresses deterrence and

21  safety of the community and everything else, the

22  sentence recommended by the government of 322 months

23  followed by ten years of supervised release is, in

24  fact, appropriate.

25          However, I recognize that what Your Honor is

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    going to hear -- and it starts with my argument because

2    I realize it's coming next -- is a significant amount

3    about the career offender guidelines, essentially as a

4    point of policy.  And I want to start right off the bat

5    by making it perfectly clear, my position here this

6    afternoon and the issue before this Court is sentencing

7    this defendant.  It's not an indictment or a praise for

8    the career offender guidelines.  The issue is this

9    defendant.

10          Your Honor's job, as I outlined in my

11   commentary, is to consider the specific circumstances

12   of this defendant and this crime.  You're not required

13   to consider what you're going to hear from Mr. Patton

14   in a second about, essentially, the defendant's policy

15   disagreements with career offender.

16          And so I stand here in sort of a unique

17   position.  I stand here on behalf of the United States.

18   I represent the Executive Branch.  Our constitution

19   contemplates the legislature congress who makes the

20   laws.  And in this particular circumstance, congress

21   said that we would like repeat offenders to be punished

22   more harshly.  Congress, that first branch, the one

23   that is representative of the people, said our

24   expectation as a society is to more harshly punish

25   those who repeat and repeat and repeat offend.

1          The State of Illinois certainly contemplates

2    increased punishment for repeat offenders.  And I'm not

3    aware of a State in this nation that does not require

4    increased punishment for repeat offenders, whether it's

5    a drug case or a sex offense or another type of case.

6          I don't stand here to offer any opinion or

7    policy position.  That's not what my job is; that's not

8    what I'm supposed to be doing.

9          I'm here as the Executive Branch tasked with

10   enforcing the laws of congress, asking the Court, the

11   Judicial Branch, to then interpret and rule in

12   accordance with the law.

13         This defendant, who is 56 years old -- and

14   defense would have you consider that and makes a claim

15   in an attempt to, I guess, pull at the heartstrings

16   that -- and makes this claim very early on in his

17   commentary -- that this case is about whether or not

18   Mr. Wilkinson should die in prison.  That's not what

19   this case is about.

20         This case is about looking at the 3553(a)

21   factors and applying them to the crime Mr. Wilkinson

22   committed and holding him accountable.  And our society

23   has determined that drug traffickers, who contribute to

24   the burden on society that drug use creates, should be

25   held to account via the criminal just system.  And

1   that's all I'm saying on that point.  I'm not going

2   down a policy-argument road because it's not what --

3   because I'm asking the Court to consider this defendant

4   and this case.

5        We know that methamphetamine has had a huge

6   burden on this community.  We know that over the last

7   few years, there's been an increase in treatment

8   admissions, an increased burden on law enforcement, on

9   healthcare providers, and on the community as a whole.

10  And this defendant would ask you to consider his age as

11  if somehow a younger drug trafficker, it's okay to hold

12  them fully accountable, but because he's older, he

13  shouldn't be.

14       But then there's the flip side with what we know

15  about age and criminality.  Typically, offenders age

16  out.  This defendant didn't.  He escalated his crime.

17  And now he's not only drug trafficking, but he's doing

18  so while armed with a loaded, deadly weapon; a deadly

19  weapon, that as the Court has seen in the change of

20  plea transcript, he wants to minimize his connection

21  to.

22       I'm obviously not asking the Court to, at this

23  point, do anything in terms of the acceptance of

24  responsibility points and decreases.  But I think the

25  Court can and should consider that full acceptance of

1    responsibility in determining whether or not the

2    sentence the government recommends is appropriate in

3    terms of the defendant's risks to recidivate.

4        We can talk about statistics as they relate to

5    career offender, or the Sentencing Commission came out

6    and said Federal firearms are at a risk.  But we can

7    look at all these statistics and they're in an

8    environment where we're looking at averages.  They

9    don't tell us anything, necessarily, about this

10   particular person and this crime.

11       This is a defendant who has been previously

12   sentenced to a 20-year term of imprisonment for drug

13   trafficking, and that wasn't enough to deter his

14   conduct.  And that is a large part of why the

15   government recommends 322 months.

16       The defendant offers many reasons about his

17   childhood that he -- I would say -- takes the position

18   that these are excuses for his behavior.  I would

19   submit to the Court that -- again, this goes back to

20   the wealth of data and studies we have, right? -- we

21   know -- and there are studies, like studies about

22   adverse-childhood experience -- that there are risk

23   factors, such as a bad childhood, that can put someone

24   in a more vulnerable position to then go out and commit

25   crimes themselves.  I'm not disputing that and that's

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1  something that Mr. Patton addresses.

2       However, Judge, it also ignores all these people

3  who have those same and, frankly, sadly, worse

4  experiences than this defendant had who are not out

5  drug trafficking with a loaded firearm.  So these

6  things cut both ways.

7       What we're left with then at the end of the day,

8  again, is this defendant who made the decision to

9  traffic methamphetamine from Missouri to Illinois while

10 high and armed with a loaded, deadly weapon; this

11 defendant, who for many years, it would appear was a

12 law-abiding citizen.  I don't have anything to say

13 otherwise.  So he was capable of following the law and

14 instead, again, chose not to and instead escalate his

15 behavior.

16      I just want to close with this:  I don't get

17 another chance to come back after what I'm sure will be

18 a detailed presentation by Mr. Patton about the career

19 offender guidelines, and so I just leave the Court with

20 this.  The defendant is asking you to consider all

21 these other statements by the Sentencing Commission

22 about those Guidelines, but then ignore the Guidelines.

23      What I am saying is that the Court needs to look

24 at this defendant; this case, this crime; this

25 defendant's extensive criminal history; and long,

1    22-year career of trafficking of methamphetamine.  A

2    variance is not appropriate in light of those

3    circumstances.  And the Court is not required to

4    consider this blanket challenge to a policy point that

5    could apply on this case and many other cases into the

6    future.

7         The government asks that this Court look at the

8    offense, look at the seriousness of the defendant's

9    criminal history, and his behavior and consider that

10   many of the points that Your Honor's about to hear can

11   essentially be argued the other way when we talk about

12   policy positions.

13        I'm not here to argue a policy position.  I'm

14   here to note that congress has said that repeat

15   offenders are, in fact, to be punished more harshly

16   than first-time offenders and ask that this Court do so

17   in accordance with the law.

18        Thank you.

19     THE COURT:  Thank you, Ms. Seberger.

20        Mr. Patton?

21     MR. PATTON:  Thank you, Your Honor.

22        If I could, I'll just stand here because I'm

23   going to do --

24     THE COURT:  Not a problem.

25     MR. PATTON:  You know, Your Honor, I don't think you

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

1    need a guideline book to tell you that if you're

2    sentencing somebody who has prior convictions, that you

3    ought to give them a longer sentence than somebody who

4    doesn't have any priors.  I have no beef with that

5    idea.  It makes perfect sense.

6          The question is:  Does it have to be

7    322 months?  Right?

8          And the government doesn't give you some other

9    way of getting to this, you know, odd number.  You

10   know, 322 months, I don't think that's, you know,

11   the -- number one, that's just not how people think

12   about lengths of sentencings -- right? -- before you

13   ever pick up the Guidelines and read them.  You know, I

14   don't think when -- before you come in contact with the

15   Guidelines you ever thought about, yeah, 316 months,

16   yeah, yeah; that sounds right.

17         You know, it would be like, hey, you're going

18   to get five years; you'll get ten years; you'll get ten

19   and a half years, things like that.  So the 322 months,

20   it's the career offender guideline; I mean, that's what

21   it is in the 924(c) mandatory 60.  And so, you know,

22   yeah, that's why we're going to talk about the career

23   offender guideline because that's what they're asking

24   you to base your sentence on.

25         But it's just kind of odd that they're going to

1   say, yeah, rely on the Guidelines for the 322 months,

2   but then somehow say, but don't look at what the people

3   who write the Guidelines say about the career offender

4   Guidelines.  That doesn't make much sense to me.

5          And the idea that, you know, well, congress said

6   they wanted repeat offenders punished higher, yeah,

7   okay, fine.  The Seventh Circuit has said -- and every

8   other circuit in the country -- Seventh Circuit in the

9   *United States v. Corner* said, hey, yes, the fact that

10  there's a portion of the Sentencing Reform Act of 1984

11  that directs the commission to ensure the guide-- to

12  write the Guidelines in a way that call for a

13  sentencing at or near the statutory maximum if you have

14  these priors, does not make the career offender

15  guideline binding.

16         The Seventh Circuit said -- for a while, the

17  Seventh Circuit case law was that it's binding.  You

18  know, post *Booker*, the Seventh Circuit and some other

19  circuits said, yeah, okay, the Guidelines are advisory,

20  except career offender and except the crack-powder

21  thing because the crack-powder thing is based on

22  congress's, you know, differentiation between crack and

23  powder in the -- in Section 841, right?

24         And the Supreme Court on the crack-powder thing,

25  when it got up there in *Kimbrough v. United States*, the

1    Supreme Court said, no; when we say the Guidelines are

2    advisory, we mean the Guidelines are advisory.

3          And, you know, when you have a guideline where

4    the people who write the Guidelines say, yeah, this

5    guideline, we're not saying we think it's right; in

6    fact, we think it's, like, not right, but we feel

7    constrained by some directives that congress has given

8    us, so we've written them the way we've written them,

9    but we really don't think they result in sentences that

10   are sufficient, but not greater than necessary to

11   achieve the goals of sentencing.

12         The Supreme Court said, yeah, in those

13   situations, it kind of makes a lot of sense for a

14   district judge not to follow that guideline.  You can

15   follow them if you want to, and it won't be found to be

16   an abuse of discretion.  But the Supreme Court cannot

17   be more clear that, no, advisory is advisory.  And the

18   career offender guideline is advisory.

19         And so then you're like all right, well, what's

20   the idea behind the career offender guideline?

21   Originally, it was, hey, you're going to get serious

22   repeat offenders.  And the way the statute is actually

23   written, if congress would have -- or excuse me, if the

24   Sentencing Commission would have written the guidelines

25   in the way congress actually wrote the statute and

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    required the prior to be a violation of any part of

2    Title 21 of the United States Code, you could at least

3    make a better argument that you'd be getting more

4    serious people.  But not in reality because, really,

5    the people the Federal charges aren't that different

6    than the people the State do.  They're all the poor,

7    powerless people that are at the bottom of the rungs;

8    they never get any farther up than one or two up the

9    rung.

10          Which is why, of course, none of the

11   prosecutions over the past 30 to 40 years that we've

12   been fighting the war of drugs have had any impact on

13   the availability of drugs.  The only thing that's

14   happened is there's more drugs, they're pure, and

15   they're cheaper.  So by the way, I would, you know,

16   gauge success or failure, it's a pretty big failure,

17   but we keep doing it.  And it's illegal, so you have to

18   impose sentences for it.

19          But, you know, once you say all right, well, all

20   we're going to have State court prior sentencings be

21   involved -- I mean, can anybody seriously say that

22   Tom Wilkinson is a big-time, serious drug dealer?

23   Right?  He became addicted to meth in his 30's.  He got

24   caught a couple times trying to manufacture meth.

25          I remember the old days when all the meth cases

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

```
 1   were the meth manufacturing, you know, the local labs.
 2   A lab being a five-gallon bucket, some pseudoephedrine
 3   pills, lithium strips pulled out of lithium batteries
 4   cut apart, and some anhydrous ammonia.  And half the
 5   time, they wouldn't get any meth.  When they would get
 6   some meth, it would be not very pure.  And if you're
 7   trying to manufacture it that way, you are not high up
 8   on the Guidelines.  You're trying to make enough to
 9   feed your addiction.
10        We're not in that world anymore.  You know, when
11   we took pseudoephedrine off the shelves -- which was
12   going to be, awe, we'll stop the meth problem.  We'll
13   just take the pseudoephedrine off the shelves;
14   therefore, you can't send -- what was affectionately
15   called -- the smurfs to go out and either shoplift it
16   or go to 20 different Walmarts in a day buying five
17   packages of pseudoephedrine.  But, all right, no more
18   meth.
19        Well, not so much because then all that happened
20   is the drug Cartels outside the country were like,
21   well, here's a very good marketing opportunity.  We can
22   now start making the meth.  We'll make it better, so
23   it's higher purity and just in quantities that dwarf
24   what people were able to make locally.  And you have a
25   worse meth problem than you had before.  But no matter
```

1    how you look at that, Tom is at the bottom of that

2    process.

3           And so you're trying to decide, how much

4    punishment is enough?  Of course, the question isn't

5    should he be punished or should he not be punished.  He

6    should be.  And, yes, driving up the interstate at the

7    speeds he was driving while high on meth is terribly

8    risky and it's not acceptable and has to be addressed.

9    I mean, if he would have never made it here, I'm sure a

10   judge in Montgomery County would have given him a

11   pretty high sentence just on the conduct of driving

12   under the influence and having the weapons.

13          So it's not should he get a sentence.  Yeah, he

14   should.  Now it's going to be a minimum of 20.  And

15   then the question is:  Are you accomplishing anything

16   of going from 20 years to 26.8 years, right?  And not

17   only are you not accomplishing anything, does doing

18   that actually satisfy the requirement that the sentence

19   be sufficient, but not greater than necessary to

20   punish?

21          And, yeah, I'm asking you to consider Tom's age.

22   And I'm asking you to consider Tom's childhood because

23   one of the factors that you have to consider in

24   imposing sentence is his history and background, which

25   isn't just his criminal history.  It's every about him.

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

1    And giving 20 years to a man who's 56 years old is

2    different than 20 years to a man who's 26 years old.  I

3    don't want either of them to get 20 years, but some

4    offenses call for those kinds of sentences, if you kill

5    somebody, if you rape somebody, something like that.

6    But for just distributing the drugs that you're

7    addicted to so you can keep feeding your addiction, I

8    would submit these sentences are crazy.  And they're

9    especially crazy when we have, you know, 30 years of

10   evidence to establish that they don't do what congress

11   thought they were supposedly going to do.

12         And so, yes, when the Sentencing Commission is

13   telling you, yeah, doesn't make any sense, then I think

14   that is something -- I would hope that that is

15   something you would take into account when you are

16   considering your sentence.

17         And if my calculations are right -- could I turn

18   the screen on?  I did a lot of different various,

19   potential outcomes here as to what the different

20   potential guideline ranges were going to be based on

21   career offender; noncareer offender; getting minor

22   participant, not minor participant.  And for good

23   measure, I threw in the meth mixture versus meth

24   purity.  I didn't put that in my commentary because

25   there was enough there already.

1        But just off of if there was no career offender

2   and he was a minor participant, that would be an

3   offense level of 28, right?  Because you'd found that

4   the -- before acceptance, it was going to be a 31,

5   minus three takes you down to 28, and he was going to

6   be a criminal history category 4.  So it's 110 to

7   137 months just on the career offender -- or excuse me,

8   on the Guidelines.  And then if you add the five years

9   on, you're at 170 to 197 months.

10        If you did the mixture or substance instead of

11   meth purity, I mean, now you're down to 70 to 87 months

12   then 130 to 147 months.  Those numbers are a little

13   different because the grouping rules change.  Instead

14   of getting one and a half units, you get two units, so

15   you add two levels instead of one; that's why it's a

16   little bit of a change there.

17        And so that just, you know, gives you an idea of

18   the sentencing range he's looking at without career

19   offender.  That's the work that career offender is

20   doing.

21        And as the Sentencing Commission points out,

22   because the statutory maximum on the drug offenses are

23   so high, it's -- the career offender enhancement just

24   has that much more of an impact on the drug cases

25   versus many of the common crimes of violence.  And it's

 1    just another perversity in the sea of perversity that

 2    the career offender swims around in.

 3            So then, you know, just look at drug

 4    sentencings.  This is the Sentencing Commission

 5    website, and they just came out with this geographic

 6    sentencing data.  And the goal of it is to let you

 7    compare national averages versus -- you can break it

 8    down by circuit or you can break it down by district,

 9    and then you can break it down by sentencing length by

10    type of crime.  And so this is that; it's Table 7 for

11    the Central District of Illinois.

12            And if you look at drug trafficking nationwide,

13    the mean sentence is -- this was for fiscal year 2022,

14    so October 1st of '21 through September 30th of '22.

15    If 70 was the average, 60 is the median; meaning,

16    there's the same number above 60 as below 60 for the

17    nation.

18            Here in the Central District of Illinois, both

19    the mean and the median is 120 months.  People getting

20    sentenced in this District for drug offenses get longer

21    sentences than other places in the country.  And

22    primarily, I would submit to you that the reason for

23    that is the United States Attorney's Office's policy in

24    charging drug amounts that trigger the mandatory

25    minimums and filing 851 notices.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1          In 2016, the Sentencing Commission did a study

2    of the use of mandatory minimums.  And what they did is

3    for fiscal year 2016, they pulled every drug PSR to see

4    if the person was charged.  This was before the First

5    Step Act, so it didn't matter what was charged in

6    the -- you didn't have to charge it in the indictment.

7    But they look to see, were you charged with a 21 U.S.C.

8    841 offense?  Did you have a prior conviction that

9    would have qualified at then -- at that time, it was a

10   prior felony drug conviction is -- it changed, the

11   First Step Act changed what priors could be used to

12   increase to the serious drug felony now.

13          Under the old version of prior felony drug

14   offenses, a felony marijuana possession conviction

15   could be used to increase the mandatory minimum, and

16   the Central District of Illinois filed tons of those.

17          And so what they did is they went back and said,

18   *all right, your sentence for the drug offense, that*

19   *could have the penalties raised using an 851 notice*.

20   They then look at the PSR's and say, *did you have a*

21   *prior that could have been used to increase*?  Then they

22   took the next step of, did the government actually take

23   the step of asking -- filing an 851 notice and asking

24   for the higher sentence?

25          This is what they found:  That the Central

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    District of Illinois did it in 74.6 percent of cases,

2    and the next highest in the Northern District of

3    New York was 56.1.

4            Now, when I presented this table to Judge Shadid

5    several years ago in Urbana, the AUSA in this case

6    stood up and interrupted me in my argument saying, *I'm*

7    *surprised the 74.6 is so low.  It should be*

8    *100 percent*.  And I have the transcript.

9            And, indeed, it is too low because in

10   plea-agreement cases, they'll put in the plea

11   agreement, you waive the right to have the 851 notice

12   filed, but you agree the higher penalty applies.  And

13   so the commission study wouldn't have captured those.

14           And so -- and I want to make clear, I understand

15   Ms. Seberger does not control her office's policy on

16   when 851s get filed.  And she could have filed two

17   851s -- you know, notice of two priors -- and made

18   Mr. Wilkinson look at even more time.  And I am very

19   grateful that she did not do that.  And so this

20   argument about the U.S. Attorney's Office's policy with

21   851 is not directed at her because she doesn't -- I

22   know she doesn't control it.

23           But I'm not making the argument to say that

24   Mr. Harris is a bad person or that Mr. Gilmore is a bad

25   person because I know they're not, but that's the

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

1    culture here.  And I've practiced other places, and
2    it's not the culture in other places.  The Western
3    District of Pennsylvania, where I practiced for
4    15 years, didn't even make the list because they just
5    rarely file 851 notices.  You know, and no black
6    helicopters were sent from Main Justice to scoop up the
7    prosecutors and, you know, take them to an undisclosed
8    location because they weren't following directives.
9    You know, it doesn't have to be this way, but it is
10   here and, you know, it puts limits on what a sentencing
11   judge can do.
12         And so I think when you are trying to decide,
13   you know, a sentence, you know, part of what you're
14   trying to do is avoid unwarranted sentencing
15   disparities, right?  Well, that's got to be more than
16   just -- you know, that's supposed to be a Nation-wide
17   thing.  You know, the whole idea of the Guidelines is
18   to try and normalize sentences across the country so if
19   you have a defendant with a similar background who
20   commits a similar crime in a similar way, gets the same
21   sentence in Los Angeles than they get in Portland.
22         Now, it's always a bit of a fool's errand, but
23   you got to try something and I get that.  But, you
24   know, what the Guidelines -- what they didn't figure
25   into -- I don't think -- and then what they've never

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

```
1   then come back and acknowledged is that, yeah, the
2   sentencing discretion that the judges used to have to
3   create this unwarranted disparity, all it did was get
4   handed over to the prosecution in deciding who am I
5   going to charge; what am I going to charge them with;
6   am I going to file 851 notices.
7           And, you know, I'd rather the Article 3 Judge
8   have that discretion than one of the parties in an
9   adversary system.  But that's not what we have.  But
10  that's why you end up with these really high, you know,
11  sentences here in the Central District that are out of
12  proportion with other places in the country.
13          And, you know, so when it comes down to -- I
14  think 20 years is orders of magnitudes longer than
15  what's sufficient, but not necessary -- sorry -- to,
16  you know -- it's too long.  But you can't do anything
17  about it and I get that.  And you can give him the
18  322 months, and you'll never get reversed by the
19  Seventh Circuit because it's a guideline sentence.  And
20  they, to my knowledge, have never found a
21  within-guideline sentence substantively unreasonable
22  for being too long.
23          You know, Tom was doing well when he got out of
24  the Missouri Department of Corrections.  For seven
25  years, he stayed out of trouble, which I would submit
```

1  to you is quite a feat and, you know, motivated part of

2  it.  And he'll make a statement to you, and I think

3  you'll hear about it.  You know, he was in the Missouri

4  Department of Corrections when he got told his son was

5  dead from drugs.  And so he was able to get himself,

6  his life, turned around and do well until he had to

7  start getting the opioids for his hip problems.

8         And I don't knock the doctors for giving him the

9  pain pills.  You know, I don't think this was, you

10  know, some pain -- you know, pill-mill thing.  You

11  know, his hips were in some end-state degenerative

12  arthritis.  He needs to -- it would be torture not to

13  give him the pills and then not to do the hip

14  replacement.  And if you're doing the replacement, you

15  got to give him pain medication or else it really would

16  be torture.

17         But unfortunately, for somebody like Tom, you

18  know, he's off to the races once he gets it.  And I

19  think the medical records show even -- you know, he was

20  hooked on the pills and was engaged in some

21  drug-seeking behavior while he was on the pills.  He's

22  an addict and, you know, it's -- it's like an

23  alcoholic.  I don't want one drink; I want ten or more.

24  And the same with addiction.  It's, you know, hey, you

25  know, if one's good, ten's better, 100's better, yeah.

1          And then when the doctors cut him off -- which

2     they had to.  Again, I'm not casting any dispersion on

3     them -- what's he got left?  Meth.  And now he's here.

4          And, you know, he's paying a heavy price.  You

5     know, it is just a reality of the situation that his

6     mother is unlikely to still be alive when he gets done

7     with prison.  You know, Tom's dad died young.  You

8     know, his genes aren't the best on that.

9          But I think the letters that various people

10    wrote to Your Honor do show you a side of him that's

11    different than the side you see based on the offense

12    conduct in the PSR, which is bad; it is, but it's not

13    all of it.  It's not everything you need to know about

14    Tom Wilkinson.  His sister, Dawn, is here, you know, in

15    support of him.  And it's just a tragedy all the way

16    around.

17          And look, if prosecuting drug people could stop

18    the drug problem, then I'd be like, yeah, you got to do

19    it.  But it doesn't.  So it's just kind of insanity.

20    You know, they just keep doing the same thing expecting

21    a different result.  We don't get the different result,

22    but we keep doing it and we keep hammering them and

23    hammering them hard.

24          And so I'd just -- I would ask that you consider

25    just imposing the 240-month mandatory minimum with 15

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1   on Count 1 and 5 on Count 2, you know, the ten-year

2   minimum of supervised release on Count 1.

3          Between, you know, 30 years, I mean, that almost

4   certainly has covered Tom's entire life between

5   20 years in prison and 10 years of supervised release.

6          And I did want to mention -- Tom wanted me to

7   mention that at the Livingston County Jail, he finished

8   a drug program there and got a certificate for Smart

9   Recovery, about a 40-hour program he did in Livingston

10  County, trying to do what he can do to improve his

11  situation.

12      THE COURT:  Thank you, Mr. Patton.

13         Mr. Wilkinson, now is your opportunity to

14  address the Court.  Is there anything that you would

15  like to say to me before imposition of the sentence?

16      THE DEFENDANT:  Yes, ma'am.

17          I've been an addict my whole life.  I've never

18  been a drug dealer.  I was in some of the wrong places

19  at the wrong time; you know?

20          And the point of coming to Illinois wasn't

21  intended to happen.  It was to go pick somebody up to

22  take them back to Missouri to see their daughter for

23  their birthday for the weekend.  And I stopped at a bar

24  and I met somebody; that's when I got what I did.  And

25  I brought it -- he told me to bring it over and I told

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

1    him I would.  I didn't know where I was taking it.  He

2    just told me when I got to Lincoln to call him.  I

3    never did make it.

4         My whole life I've been struggling with

5    problems.  And I'm trying to make the Court feel sorry

6    for me because I didn't have the best upbringing; you

7    know?  Argued with my step-dad.  I fed my problems by

8    getting high.

9         I've never been a drug dealer; you know?  I

10   never trafficked drugs.  I just was around people and

11   got caught when there was drugs around.

12        This last time, I got caught on the highway

13   speeding taking what I was taking for that person.  I

14   don't even know the guy.  I never even knew him; you

15   know?  I never grew up with him or nothing.

16        But my whole life I fed my addiction by trying

17   to cover up all my problems and child abuse and

18   everything from my -- growing up.

19        You know, I lost my son in 2012 because of my

20   addiction.  I was in the Department of Corrections, two

21   miles away from where the funeral was.  I didn't get to

22   go.

23        My best friend, he died in the same prison

24   because he tried helping somebody out just like I was.

25   He had cancer.

1          I lost my dad at the age of 53; I was 34.  And I
2     only got to see him, like, ten times.

3          So over losing my son and my dad, I never got to
4     meet my dad's side of the family.

5          I fed my addiction, you know, by trying to cover
6     up everything that's happened to me, you know, arguing
7     with my step-dad and my whole life.  I got put in a
8     foster home when I was 12 for a year, taken away from
9     my brothers and sisters I grew up with; you know?  So
10    when I got out, I started getting high again at a young
11    age.

12         You know, I've been an addict.  I've never been
13    a drug dealer.  I've never been somebody that was out
14    selling drugs to make a living.  I worked my whole
15    life.

16         When I was 19, I started work up in St. Louis.
17    I got, like, $30,000 worth of welding certifications.
18    I had to take an aluminum welding test.  I was the only
19    one to pass the test in our shop.  I worked on the
20    cargo jets that took our military equipment and our
21    troops to Iraq and Afghanistan, the one that brought
22    them back that was on TV you see.  I worked my whole
23    life.

24         I've built the Rams the old stadium in downtown
25    St. Louis.  The skyscrapers across from the Arch that's

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    a green roof across I55, it took us two and a half

2    years to build that.  I worked on the Federal court

3    building in downtown St. Louis.  Anheuser-Busch, I

4    worked -- I built the building.  If you look at 55

5    going down 55 where the horses are in front of the

6    building, the building to the left of the that, we

7    built that.  There's a lot of things that I've built.

8    You know, I did a lot of good things.  I worked for

9    Anheuser-Busch for a while for a training-car company.

10           You know, in between being an addict -- I still

11   was getting high, you know, in between jobs, you know,

12   to try to forget about, you know, money problems; you

13   know?  I always had to feed my addiction by covering up

14   the things I grew up around, losing my son; not being

15   able to see my dad, you know, my side of the family.

16   But I worked my whole life; you know?  I haven't been,

17   you know, a bad person.  I always went out of my way to

18   help everybody out; you know?

19           I mean, my mom's getting old; you know?  She's

20   73.  I've talked to her the last few days.  She's

21   upset.  She's afraid I'm not going to make it home.

22   She wants me to be sent home on an ankle bracelet, you

23   know, so I can be there for her; you know?  She's got

24   osteoporosis, deteriorating bone disease.  You know,

25   she's had shoulder replacement, a hip replacement -- I

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1   mean, knee replacement.

2          You know, I worked my whole life; you know?

3   I've never been a bad person.  What happened the night

4   I came over here wasn't something that was planned.  It

5   just happened that night; you know?

6          I'm asking, please, to show leniency on me.

7   Please don't give me all that time.  You know, I

8   promise I'll go back home and be good.

9          You know, I know I got a long history of

10  addiction.  I ain't never been no drug dealer or no

11  trafficker.  Just because them trafficking charges are

12  trafficking charges just because I was at the wrong

13  place and somebody that was making dope was there and I

14  was getting high.

15         You know, I worked my whole life.  I haven't

16  been a drug dealer.

17         All right.  I want to say I'm sorry to my sister

18  and my family.

19         And I'm asking please, Your Honor, don't give me

20  much time where I can go home and spend time with my

21  family, even if I have to go on an ankle bracelet or

22  whatever.  I'll take treatment classes or whatever it

23  takes, you know, so I can rehabilitate myself.

24         You know, I never hurt nobody ever in my whole

25  life.  You know, I've always helped everybody.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

 1    THE COURT:  Is there anything else you'd like to

 2    say, sir?

 3    THE DEFENDANT:  That's it, Your Honor.

 4    THE COURT:  I appreciate your statement here today.

 5         What I'm going to do is take a short recess,

 6    and then I will come back in in a short period of time.

 7         Thank you very much.

 8              *(Recess at 12:56 p.m.)*

 9    THE COURT:  Back on the record after taking a short

10    recess to consider the defendant's allocution as well

11    as arguments of counsel as to the sentence that will be

12    imposed today.

13         For purposes of the record, I will note that

14    the defendant's objections as to the last sentence in

15    paragraph 23 is going to be overruled.  I wanted to

16    make sure that I noted that for the record.

17         I'm also noting -- and everyone's

18    acknowledging -- that pursuant to *U.S. v. Booker*, the

19    Guidelines are advisory and they are not mandatory.

20    And that, of course, also applies to the career

21    offender guideline.

22         I recognize, as Mr. Patton points out in his

23    commentary and argued here today, that Courts are free

24    to disagree with the Guidelines as a matter of policy,

25    especially the career offender guidelines.

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

 1          In determining an appropriate sentence, I have

 2    considered the factors set out in Title 18 U.S.C.

 3    Section 3553(a); particularly, the nature and

 4    circumstances of the offense and the history and

 5    characteristics of Mr. Wilkinson in reaching a sentence

 6    for him.  I've also now considered the evidence and

 7    testimony presented today as well as arguments of

 8    counsel.

 9          As I stated earlier, there is a statutory

10    minimum of 15 years following my ruling on the

11    objection and five years consecutive on the 924(c)

12    count.  So my discretion is very limited in this

13    circumstance outside of that.

14          Mr. Wilkinson, you appear for sentencing at age

15    56 after pleading guilty to possession with intent to

16    distribute 50.0 grams or more of actual

17    methamphetamine, possession of a firearm in furtherance

18    of a drug-trafficking crime, and felon in possession of

19    a firearm.

20          Ultimately, you are being held accountable for a

21    total of 187.4 grams of ICE methamphetamine and 27.0

22    grams of methamphetamine.

23          At the time of your arrest, you were in

24    possession of a black Hi-Point, Model C9, 9mm

25    semi-automatic firearm.

USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)

1          As the government notes, you were also driving

2   under the influence of drugs at the time of your

3   arrest, placing others at significant risk.

4          Methamphetamine is a major problem.  Everyone

5   here has identified it.  And also, Mr. Wilkinson, you

6   have lived it throughout your time as an addict.  So we

7   know that that's happening in the Central District of

8   Illinois, and it's all the more serious when a firearm

9   is involved with drug distribution, which is why you

10  face a lengthy sentence today.

11         The government's commentary states in recent

12  years, there has been an increase in criminal

13  convictions due to methamphetamine and a five-fold

14  increase in treatment admissions.

15         Mr. Wilkinson, you've heard today -- everyone's

16  argued -- that you have a lengthy criminal history.

17  Your first major offense occurred in 2001 at age 34

18  with a Missouri conviction for trafficking in drugs,

19  first degree, in which you were sentenced to 20 years

20  and appeared to have served between five and six years

21  of that sentence.

22         Your parole was later revoked, and you served

23  another two and a half years.

24         You had another 2001 drug-trafficking,

25  second-degree offense in which you were sentenced to

1    15 years to run concurrently with the 20-year term.

2           You have 2010 convictions for possession of a

3    controlled substance for which you received a sentence

4    of seven years, and attempt to manufacture

5    methamphetamine for which you were sentenced to ten

6    years to run concurrently.  It appears that you served

7    three years for that conviction.

8           The government notes this is not your first

9    firearms offense.  You had a misdemeanor firearm

10   conviction back in 1999.

11          While the government states your prior

12   imprisonment terms have not acted as a deterrent and

13   you now are drug trafficking while armed, the

14   defendant's commentary states that you have been

15   convicted of multiple low-level drug offenses and

16   committed this offense to feed your own addiction.

17          Because of the mandatory minimums, whatever

18   sentence I impose today will be significantly longer

19   than any term you have served thus far.  I certainly

20   understand how difficult that is for your family, as

21   the letters of your mother and sister made clear.

22          It appears as though you did have a somewhat

23   difficult childhood.  According to the PSR, your

24   parents divorced when you were about nine months old

25   due to your father's abuse of alcohol.  And you report

1  your stepfather prevented you from having a

2  relationship with your father.  As a result, you had

3  very little contact with your father, and you had a

4  poor relationship with your stepfather, as the letter

5  from your mother notes.

6       Your stepfather was an alcoholic who verbally

7  and physically abused you.  You were placed in a group

8  home for about a year when you were approximately 12,

9  which you indicated in your statement today, which,

10  obviously, would be very traumatic for a child and it

11  was for you.

12       You report having a positive relationship with

13  your mother and siblings and your sister is here today.

14       Unfortunately, your son passed away from a

15  heroin and Fentanyl overdose in 2012.  And your

16  sister's letter talks about how difficult that was for

17  you.

18       You have one adult daughter with whom you have a

19  good relationship and 2-year-old granddaughter.

20       In terms of education, you graduated from high

21  school and earned an auto body and welding program

22  certificates of completion while in high school.

23       You report receiving social security disability

24  benefits since 2019, following your two hip replacement

25  surgeries.  Your were previously employed as a

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    fabricator and upholsterer and the letter of

2    Mr. Faulkner speaks very highly of you as an employee

3    and as a friend.

4         In terms of your physical health, you had your

5    gallbladder removed in 2018.  And that year, you had

6    left hip replacement surgery for end-stage arthritis.

7    In 2019, you had the same surgery for your right hip.

8    In 2021, you were diagnosed with high blood pressure

9    and prescribed medication for a time; though, it

10   appears you no longer are taking that medication.

11        In terms of mental health, you report receiving

12   mental health counseling for approximately one year

13   around the age of 13, following your discharge from the

14   residential group home.  You don't believe mental

15   health services are needed at this time.  Though, your

16   sister thought you might benefit from such a program

17   because of your son's death.

18        And you did report having difficulty sleeping at

19   the Livingston County Jail and taking prescribed

20   medication to treat that condition.

21        In terms of substance abuse, you report having

22   no history of alcohol abuse.  Prior to your arrest, you

23   state you used marijuana weekly and have a lengthy

24   history of using methamphetamine.

25        After relapsing in 2020, you used

1   methamphetamine on a daily basis.  Your mother and

2   sister believe your relapse was caused by the pain

3   medication you took after your hip replacement

4   surgeries.  As reflected in your medical records, your

5   commentary states that you were prescribed Norco, a

6   pill containing hydrocodone, acetaminophen, and other

7   medication for your pain and before and after your

8   surgeries.  Medical staff reported that you were

9   engaging in drug-seeking behavior.  When you report no

10   longer being prescribed drugs, you turned to

11   methamphetamine.

12        You report successfully completing a substance

13   abuse program during a prior term of incarceration as

14   well as a program that you took recently.  And it's my

15   understanding you have expressed an interest in

16   receiving substance abuse treatment during your BOP

17   term, which I will recommend.

18        You state that your future plans are uncertain,

19   given your age and your lengthy incarceration term that

20   you face.  The defendant's commentary notes that at

21   your age, you can expect to live about 23.5 more years.

22   The guideline range results in an advisory range of

23   26.8 to 32.5 years of imprisonment.

24        Your commentary notes that the Sentencing

25   Commission's 2016 report, which detailed the career

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    offender guidelines flaws, concluded in quote,

2    "Drug-trafficking-only career offenders are not

3    meaningfully different from other Federal

4    drug-trafficking offenders, and should not

5    categorically be subject to the significant increases

6    in penalties required by the career offender

7    directive."  Judges have often exercised their

8    discretion to impose sentences within the noncareer

9    offender guideline in the years since judges have been

10   afforded that discretion.

11          In 2022, the average sentence imposed on a

12   career offenders was 141 months, well below the average

13   career offender guideline minimum of 210 months.  The

14   vast majority of district judges impose sentences below

15   the career offender guideline.

16          The defendant's commentary further provides that

17   while the goal of the Guidelines was to provide

18   fairness in meeting the purposes of sentencing, it is

19   debatable whether that has occurred and that following

20   the career offender guideline can lead to unwarranted

21   sentencing disparities.  The career offender guideline

22   is not the product of the Sentencing Commission's

23   expertise.  Moreover, congress enacted numerous drug

24   laws that included mandatory minimums, which

25   effectively prevented individualized sentencing,

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1   especially in a career offender context.

2        The defendant's commentary provides that the

3   inclusion of State drug offenses as career offender

4   predicates has resulted in turning what are

5   low-level-retail drug offenders, often from poor

6   neighbors, into career offenders.

7        Additionally, Federal drug statutes have very

8   high statutory maximum sentences, often higher than

9   those for violent offenses, and those maximums affect

10  the guideline range.

11       Here, because the statutory maximum is life, the

12  career offender base level is 37.

13       Defendant's commentary notes that a Hobbs Act

14  robbery of a convenience store, which includes

15  threatening a clerk with a gun, has a 20-year

16  maximum -- statutory maximum, which would result in a

17  base level offense of 32.  In such a case, a defendant

18  who possesses approximately 200.0 grams of

19  methamphetamine would face a sentence 12 years longer

20  than one who robs a store at gunpoint.

21       The Sentencing Commission's 2016 report found

22  that the drug-only career offenders, like

23  Mr. Wilkinson, recidivate at the same rate as noncareer

24  offenders.  Defendants who are career offenders due to

25  committing crimes of violence recidivate at

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1   significantly higher rates than noncareer offenders.

2       As the defense commentary identifies, as well as

3   what has been argued here today by Mr. Patton, without

4   the career offender enhancement and with a minor-role

5   adjustment, Mr. Wilkinson's guideline range would be

6   significantly less than the 322 months requested by the

7   government here.

8       Also, defendant claims that those ranges are too

9   high because they were based on guidelines for actual

10  methamphetamine rather than a mixture or substance

11  containing the methamphetamine.  This was all

12  identified within the commentary, not as much argued

13  here today by Mr. Patton.

14      But as I've stated in other sentences, I

15  recognize that many legal commentators and Judges have

16  made this argument.  And Judges have varied from the

17  actual methamphetamine guidelines on the basis that the

18  purity distinction represents a poor proxy for

19  culpability and role given that almost all

20  methamphetamine now sold in the U.S. is pure.  That can

21  be an arbitrary distinction that creates an unwarranted

22  disparity between more dangerous, but less severely

23  punished substances.  Some Courts have rejected the

24  actual methamphetamine guidelines on policy grounds

25  because they are not based on imperial data or expert

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    analysis.

2         In the *United States v. Carnel*, which is a 2020

3    Seventh Circuit case, the Seventh Circuit cited a

4    District of Idaho case, which is *United States v.*

5    *Hendricks,* for its thoughtful discussion on the

6    disparity in sentencing between methamphetamine and

7    ICE.  Some Courts have found that the actual

8    methamphetamine guidelines result in an unwarranted

9    sentencing disparity compared to the relative harms of

10   other drugs such as heroin, Fentanyl, and cocaine.

11        Defendant's commentary raises the

12   sentencing-disparity argument, and I have considered it

13   in the applicability in the distinction drawn in the

14   Sentencing Guidelines between the distribution of pure

15   methamphetamine and distribution of relatively impure

16   in determining whether a variance is warranted.

17        If the Guidelines for methamphetamine mixture

18   were used and no career offender enhancement was

19   applied, defendant's commentary notes that

20   Mr. Wilkinson's guideline range would be 84 to 105

21   months with the minor-role adjustment or 100 to

22   125 months without such adjustment.

23        As the parties recognize, both Section 3553(a)

24   and the Guidelines provide that a Court should look at

25   the whole individual when imposing a sentence.  That

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    includes a person's childhood, background, age, health,

2    prior criminal convictions.  And the government

3    recommends, based on that, a guideline sentence of

4    322 months while defendant recommends the minimum

5    sentence based on my rulings today on the objections,

6    which would be 180 months on Count 1 plus 60 months on

7    Count 2 to run consecutively.

8         The government opposes the defense's request for

9    a variance based on Mr. Wilkinson's long history of

10   drug trafficking, which includes four prior convictions

11   for drug offenses which involve the sale and production

12   of drugs.

13        Given Mr. Wilkinson's age, a guideline range

14   could, effectively, be a life sentence, as Mr. Patton

15   argues.  Given that individuals are less likely to

16   recidivate as they age, I don't believe a guideline

17   sentence is necessary to achieve the purposes of

18   sentencing as to Mr. Wilkinson.

19        Additionally, given that Mr. Wilkinson has never

20   actually served more than six years, the concept of

21   incremental punishment would seem to suggest that

22   something less than a guideline sentence may be

23   warranted to adequately punish him for the crimes here

24   today.  As I noted, because of the mandatory minimums,

25   any sentence will still be significantly longer than

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1   any term Mr. Wilkinson has ever served.

2       Taking all of the relevant factors into

3   consideration, I find that the following sentence is

4   sufficient, but not greater than necessary to comply

5   with the sentencing purposes set forth in 18 U.S.C.

6   Section 3553.

7       Pursuant to the Sentencing Reform Act of 1984,

8   the defendant, Thomas J. Wilkinson IV, is hereby

9   committed to the custody of the Bureau of Prisons for a

10  period of 240 months.  That term shall consist of

11  180 months on Count 1 and 120 months on Count 3, to run

12  concurrently with each other, and 60 months on Count 2

13  to run consecutively to the terms imposed on each of

14  the Counts 1 and 3.

15      Court finds this sentence more than adequately

16  reflects the seriousness of the offense, promotes

17  respect for the law, provides just punishment, protects

18  the public from further crimes of Mr. Wilkinson, and

19  hopefully affords adequate deterrence.

20      Mr. Patton, is there any recommendation as to a

21  BOP placement?

22    MR. PATTON:  Yes, Your Honor.  We'd ask for the

23  Federal Medical Center in Springfield, Missouri.  And

24  as a backup -- because he may not get that -- FCI

25  Greenville.

1        THE COURT:  And that is so noted, and I will make

2   those recommendations.

3            And it's also recommended that the defendant

4   serve his sentence in a facility that will allow him to

5   participate in a program for substance abuse treatment.

6            Following your release from custody, sir, you

7   will and shall serve a ten-year term of supervised

8   release.  This term consists of ten years on each of

9   Counts 1 -- or on Count 1, two years on Count 2, and

10  one year on Count 3, all to run concurrently.

11           I believe this term of supervised release is

12  sufficient, but not greater than necessary to help you

13  transition back into society and to deter you from

14  committing crimes in the future.

15           While on supervised release, you shall not

16  commit another federal, state, or local crime.  You

17  shall not unlawfully possess a controlled substance.

18  You shall submit to one drug test within 15 days of

19  release from imprisonment and at least two drug tests

20  thereafter as directed by the probation office.

21           Pursuant to Title 34, U.S.C. Section 40702, you

22  shall cooperate in the collection of DNA as directed by

23  the probation officer or the Bureau of Prisons.

24           In addition to these mandatory conditions, I am

25  imposing all of the discretionary conditions filed by

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1    the Court for the justifications stated in the filing.

2         One of the conditions requires that within

3    72 hours of your release from custody, you must report

4    in person to the probation office in the district in

5    which you are released.

6         The remaining issues are that I find you do not

7    have the ability to pay a fine and no fine is imposed.

8         A special assessment of $300 is imposed and is

9    payable immediately.

10        Mr. Wilkinson, do you have any questions about

11   the sentence that I have imposed?

12      THE DEFENDANT:  How much time is it?

13      MR. PATTON:  20 years.

14      THE DEFENDANT:  No.

15      THE COURT:  Did you say, no, sir?

16      THE DEFENDANT:  (Nodding head)

17      THE COURT:  I'll note that you indicated *no* to my

18   question whether you had any questions about the

19   sentence I imposed.

20        Mr. Patton, do you have any legal objection to

21   the sentence I'm imposing, or are you requesting

22   further elaboration of my reasons under

23   Section 3553(a)?

24      MR. PATTON:  No, Your Honor.

25      THE COURT:  Thank you very much.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

 1            Then the sentence I just stated is the sentence

 2    that is imposed.

 3            Have I addressed all matters in mitigation?

 4        MR. PATTON:  Yes, Your Honor.

 5        THE COURT:  Thank you.

 6            Ms. Seberger, any objection by the government

 7    to the sentence imposed?

 8        MS. SEBERGER:  No, Your Honor.

 9            The only thing I have is I do -- I just want to

10    make sure that there was a preliminary order of

11    forfeiture entered.  I'm sorry if you were getting to

12    it.

13        THE COURT:  I'm sorry.  Please identify what you are

14    asking.

15        MS. SEBERGER:  Sorry.

16        THE COURT:  That's okay.  Don't apologize.

17        MS. SEBERGER:  Well, it was coming later and I went

18    too soon in how you were doing things.  I apologize

19    because this is my first sentencing in front of

20    Your Honor.

21            We did have a forfeiture allegation in the

22    indictment for the firearm.  And I just wanted to make

23    sure if there wasn't one already entered, that one was

24    entered.

25        THE CLERK:  A preliminary order was entered.

1    THE COURT:  A preliminary order was entered.

2    MS. SEBERGER:  Thank you.  Sorry.

3    THE COURT:  That's not a problem at all.

4        Is there anything else I can address other than

5    the Appellate rights?

6    MS. SEBERGER:  No, Your Honor.

7    MR. PATTON:  No, Your Honor.

8    THE COURT:  Thank you very much.

9        Mr. Wilkinson, you have the right to appeal the

10   sentence I have imposed.  Therefore, pursuant to

11   Federal Rule of Appellate Procedure 4(b)(1)(a), any

12   notice of appeal must be filed within 14 days of the

13   entry of the judgment or within 14 days of the filing

14   of a notice of appeal by the government.

15       If you are indigent or without money, an

16   attorney would be appointed to handle your appeal for

17   you without charge, and a transcript of the court

18   hearings held in this matter would be prepared and

19   given to you without charge for your appeal.

20       Is there anything else I can address here

21   today?

22   MR. PATTON:  No, Your Honor.

23   MS. SEBERGER:  No, Your Honor.

24   THE COURT:  Thank you very much for your time,

25   everyone.

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

1           Mr. Wilkinson, good luck to you.  You are

2    remanded to the custody of the United States Marshal.

3           Court is adjourned.

4                 *(Proceedings concluded at 1:38 p.m.)*

*USA v. WILKINSON, 21-cr-30021 -- Sentencing (05/01/2023)*

\* \* \* \* \* \* \* \* \* \* \* \* \*

<u>REPORTER'S CERTIFICATE</u>

I, KAILEY FENWICK, RPR, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 7th day of July, 2023.


<u>    /s/ *Kailey Fenwick*   </u>

Kailey Fenwick, RPR
IL License # 084.004869